# Illinois Official Reports

## Appellate Court

---

### *People v. Flores*, 2014 IL App (1st) 121786

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. OSCAR FLORES, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-12-1786 |
| Filed | November 14, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for first degree murder of one man and the attempted murder and aggravated battery with a firearm of a second man during a gang-related incident were reversed and the cause was remanded for a new trial where the trial court erred in denying his motion to suppress statements he made to detectives during an interrogation, since defendant's response of "Not really. No." made immediately after he was given his *Miranda* rights and was asked whether he wanted to speak with the detectives and his later comment that he "ain't gonna say nothing about nothing," unequivocally showed that he had invoked his right to remain silent and that his right to remain silent was not scrupulously honored, regardless of the State's contention that defendant was "engaging in the conversation with the detectives" and had not clearly indicated that he did not wish to speak with the detectives, and on retrial, photographs from a MySpace page will be admissible to show the course of the police investigation, but the prejudicial captions are not admissible in view of the State's inability to show who wrote the captions; furthermore, a mug shot of defendant should be avoided on retrial because such evidence tends to inform the jury of defendant's unrelated criminal activity. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CR-16031; the Hon. Maura Slattery Boyle, Judge, presiding. |

| | |
|---|---|
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Rachel Moran, all of State Appellate Defender's Office, of Chicago, for appellant. |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Christine Cook, and Peter Maltese, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE McBRIDE delivered the judgment of the court, with opinion. Presiding Justice Palmer and Justice Reyes concurred in the judgment and opinion. |

**OPINION**

¶ 1 Following a jury trial, defendant Oscar Flores was found guilty of the first degree murder of Victor Casillas and the attempted murder and aggravated battery with a firearm of Lionel Medina. Defendant was subsequently sentenced to a total of 80 years in the Illinois Department of Corrections.

¶ 2 Defendant appeals, arguing that: (1) the trial court erred in denying his motion to suppress his July statements, which were involuntary and were obtained in violation of his right to remain silent and his right to an attorney; (2) the trial court violated his constitutional right to present a defense when it barred him from presenting evidence of his suppressed May statements to police; (3) defendant was denied a fair trial when the trial court admitted prejudicial photos from MySpace without proper authentication and foundation; and (4) his trial counsel was ineffective for failing to object to testimony that defendant's photo was in a Chicago police database and he had previously been arrested.

¶ 3 The shootings occurred around 8:30 p.m. on March 19, 2007, near West 30th Street and South Kildare Avenue in Chicago. Defendant was interrogated and gave statements in May and July 2007. In May, defendant was arrested and held nearly 50 hours in an interrogation room. Defendant eventually gave statements admitting that he was the shooter. In July, he was arrested again and interrogated by one of the same detectives. Defendant again admitted during questioning to being the shooter. Prior to trial, defendant moved to suppress both his May and July statements on the grounds that: (1) his May statement was obtained in violation of his right to counsel and his right to remain silent; (2) his July statement was obtained in violation of his right to remain silent; and (3) both statements were involuntary. At the hearing, neither party presented any witness testimony, but relied on the recordings of the interrogations. After viewing the recordings, the trial court granted the motion as to the May statements, finding that defendant explicitly asked for a lawyer and the detectives improperly reinitiated questioning

14 to 15 hours later. The court did not reach the question of whether the statements were involuntary.

¶ 4      As to the July statements, the trial court held that defendant's May request for an attorney was no longer in effect. The court found that defendant did not invoke his right to remain silent because even though defendant responded, "Not really. No." when asked if he wanted to speak with the detectives, defendant "still [kept] engaging the detectives." The court concluded that defendant's *Miranda* rights were not violated. The court further found that the statement was voluntary and defendant's will was not overborne.

¶ 5      Defendant filed a motion to reconsider and asked for a ruling on whether his May statement was voluntary. The trial court denied the motion to reconsider, but found the statements were voluntarily made. Defendant also filed a motion to suppress his statements on the basis that the recordings were inaudible, which the trial court denied. Defendant later filed a motion to reopen his motion to suppress his July statements, arguing that the statements were obtained in violation of his request for counsel. The trial court denied the motion, finding that the request for counsel was not clearly expressed.

¶ 6      The State filed a motion *in limine* to bar defendant from introducing his May statements at trial. Defendant responded that he should be allowed to admit evidence of the May interrogation to explain why he confessed in July. The trial court granted the motion, finding that the suppressed statements were inadmissible hearsay. The court stated that defendant would have to satisfy an exception to the hearsay rule in order for any portion of the statements to be admitted.

¶ 7      Defendant also filed a pretrial motion to exclude evidence of MySpace photographs depicting either defendant or Casillas, based on lack of foundation and prejudice. At the hearing, trial counsel argued that "no one is going to be able to testify whose MySpace page they actually came from, or how the detectives were even allowed onto that website." Counsel asserted there was "no way to lay a foundation for this." The trial court allowed the admission of two photos at trial, finding that the photographs were not prejudicial and were relevant to the police's course of investigation.

¶ 8      The following evidence was presented at defendant's October 2011 jury trial. The State presented the testimony of former Assistant State's Attorney (ASA) Fred Sheppard. Sheppard testified that he obtained a videotaped statement from defendant at 1 a.m. on July 15, 2007. The videotape was played for the jury. Defendant stated that he joined the Latin Kings when he was 15 or 16. His nickname was "Little Panther" and no one called him "Little Rowdy."

¶ 9      On the day of the offense, defendant met Macias at South Drake Avenue and West 26th Street. They got in a van driven by a friend. They rode around for a while, and the van was parked near Drake and 27th Street. A short time later, Macias suggested they get in the van. Macias got in the driver's seat and defendant was in the passenger seat. While driving, they stopped by Macias's house. Macias went in the house and returned with a white plastic bag, which he placed under the driver's seat.

¶ 10      Macias then drove toward the Two-Six neighborhood. While they were driving, Macias took a gun out of the bag. Macias drove near 30th Street. Defendant said he asked what Macias was doing and Macias told him to stop being a "p***y." When they saw one or two "gangbangers" on the sidewalk, Macias handed defendant the gun and said, "come on p***y." Macias slowed down the van and defendant fired about four shots. Macias started to drive toward Latin King territory, but on the way, they saw a couple of men and one of them made a

gesture of disrespect to the Latin Kings. Macias told defendant to shoot them again, defendant then fired two or three shots. Macias then drove back to the Latin King neighborhood. He dropped defendant off and defendant left the gun with Macias.

¶ 11 Lionel Medina testified at trial and admitted he was a member of the Two-Six gang. On March 19, 2007, he was near 28th Street and Kildare when he saw a two-tone blue and gray van at a stop sign. The passenger pulled out a gun and fired. Medina was shot, but survived. Medina was not able to make any identifications in two lineups.

¶ 12 Leonardo Gonzalez testified that on March 19, 2007, he was walking with Victor Casillas on 30th Street when they heard gunshots. Both Gonzalez and Casillas were members of the Two-Six gang. They continued walking until he heard a vehicle behind them. He saw a blue and white van. According to Gonzalez, Casillas made a gang sign disrespectful to the Latin Kings. The passenger in the van fired two shots. Casillas started to run and Gonzalez fell down. He then saw that Casillas had been shot. Casillas fell down near 30th Street and Karlov Avenue.

¶ 13 Gonzalez was unable to make an in-court identification. Gonzalez testified that he viewed a lineup in May 2007, but he equivocated on whom he identified. He said he identified Casillas's killer but did not know if he identified defendant. Gonzalez admitted that he gave a statement to an ASA in May 2007. Two photographs were attached to the statement. One showed Casillas with the phrase "Lil Bonez Rotsk" written on it, which was disrespectful to Casillas. The second photo was of a Latin King with the caption "Little Rowdy." Gonzalez did not remember if he identified "Little Rowdy" as the shooter. The State later called the ASA who took the statement and she testified that Gonzalez identified defendant as the shooter.

¶ 14 Gonzalez also could not recall his grand jury testimony. The State later called the ASA who presented Gonzalez at the grand jury. She testified that Gonzalez identified defendant as the shooter.

¶ 15 On cross-examination, Gonzalez stated that he did not get a good look at the people in the van because he was focused on the gun. Gonzalez testified that after the shooting, Antonio Casillas, Victor Casillas's brother and also a Two-Six member, showed him a photo with the caption "Little Rowdy Drake Two-Six." He said Antonio told him to identify the person in the photograph as the shooter. On redirect, Gonzalez maintained that he only identified defendant because Antonio showed him the photograph.

¶ 16 Antonio Casillas testified that he was the older brother of Victor Casillas. Antonio stated that he had viewed a MySpace page and saw pictures of his brother and defendant. He said he recognized defendant as "Little Rowdy." He said he then looked through a Farragut High School yearbook and found "Little Rowdy" under defendant's name. Antonio viewed the MySpace pages with the help of his cousin because Antonio did not have a MySpace account. Antonio was given permission to use the password for the account of a friend of Antonio's cousin. He used this account to send a friend request to "Little Rowdy." When the friend request was accepted, he was able to view photographs. Antonio testified that he approached a police officer at his brother's funeral with defendant's name. A couple days later, two detectives came to his house and Antonio showed the detectives the MySpace page.

¶ 17 Antonio was shown three photographs from the MySpace page. The first was a picture of defendant making gang signs with the caption "Lil Rowdy." The second was a photo of Casillas with a caption "Lil Bonez Rotsk," which Antonio testified meant "bragging about how [his] brother is dead." The third photo was another picture of Casillas with the caption, "Lil

- 4 -

Bonez Rotsk!! hahaha 1 less Avers ... hahaha." Antonio stated this caption was laughing and bragging about his brother's death.

¶ 18 On cross-examination, Antonio admitted that nothing on MySpace identified defendant as "Little Rowdy." Antonio admitted he used to be a member of the Two-Six gang but had quit. He said he used the most recent yearbook, which was maybe the 2006 or 2007 Farragut High School yearbook, to make the connection.[1] Antonio denied telling Gonzalez to identify defendant as the shooter.

¶ 19 Lorena Aguilar and Elizabeth Hernandez each testified that at around 8 to 8:30 p.m. on March 19, 2007, they were walking east on 30th Street, between Tripp Avenue and Kildare Avenue, when they heard gunshots. They looked behind them and saw a two-tone Astro van. When the van passed them, Aguilar stated that she saw two Hispanic males in their twenties and Hernandez said she also saw two Hispanic males in their twenties or older. Aguilar described the driver as wearing a dark sweatshirt and the passenger was wearing a white T-shirt and had short hair. Hernandez corroborated Aguilar's description. After the van passed them and was no longer in their view, they heard more gunshots. They ran toward the gunshots and saw a group near a person who had been shot. Both women separately viewed a photo array, but testified that they could not identify the shooter. Aguilar denied that she made a tentative identification. Both women also separately viewed a lineup, but did not make an identification.

¶ 20 Lizette Martinez testified that around 8 or 8:30 p.m. on March 19, 2007, she was walking her dog eastward on 30th Street with her neighbor, Rita Serrano, when she heard four gunshots coming from behind her. She looked and saw a blue and gray Astro van head east on 30th on to Kedvale. When the van passed her, Martinez saw two males. She said the passenger was wearing a white T-shirt. She heard two more gunshots. Martinez viewed a photo array and did not make an identification. She later viewed a lineup but did not make an identification.

¶ 21 Rita Serrano testified at trial for the defense. Her testimony corroborated Martinez's except that she described the passenger in the van as a bald Hispanic male wearing a white T-shirt. Serrano did not make an identification in either a photo array or a lineup.

¶ 22 The parties stipulated that six cartridge cases were recovered at the scenes of the shootings, but no fingerprints were recovered from the casings.

¶ 23 Following deliberations, the jury found defendant guilty of the first degree murder of Casillas and the attempted murder and aggravated battery with a firearm of Medina. The trial court subsequently sentenced defendant a term of 29 years for the first degree murder conviction with an additional 25-year firearm enhancement, 20 years for the attempted murder conviction, and 6 years for the aggravated battery conviction, to be served consecutively. Defendant received a total sentence of 80 years.

¶ 24 This appeal followed.

¶ 25 On appeal, defendant first argues that the trial court erred in denying his motion to suppress his July statements to police and the ASA. Specifically, defendant contends that his statements were taken in violation of his right to remain silent and his right to counsel. He also asserts that

---

[1]Defendant's presentence investigation stated that he graduated eighth grade in 2002 and he withdrew from Farragut High School a couple months into his freshman year.

the statements were involuntary and his will was overborne. We first look at the circumstances in both the May and July interrogations in relevant detail.

¶ 26    On May 24, 2007, the police arrested defendant and placed him in a locked interrogation room at Area 4 around 9:45 p.m. Defendant was 17 years old at the time of his arrest. Defendant was held in the interrogation room until approximately 11:15 p.m. on May 26, 2007. We note that the transcripts of all interrogations are taken from a video camera located in the corner of the interrogation room. The transcripts contain several notations that the dialogue is "inaudible."

¶ 27    Defendant was repeatedly interrogated by two detectives over those two days. The detectives used excessive amounts of profanity during the interrogation. The detectives misinformed defendant that if he had not planned to specifically shoot Casillas, then it was not first degree murder and he could receive a lesser sentence and regain his life. The detectives also repeatedly told defendant that he had been identified in multiple lineups and they had six witnesses. However, defendant had only been identified in one lineup. The five other occurrence witnesses were unable to identify defendant. The detectives also frequently referred to the evidence in their possession, such as fingerprints and other evidence from the van. No evidence of this kind was presented at trial.

¶ 28    At around 8 p.m. on May 25, 2007, defendant explicitly requested to speak with an attorney. The detectives asked defendant if he wanted to end questioning to get an attorney, which defendant said he did. The detectives ended questioning at that time. However, at approximately 1:15 p.m. on May 26, 2007, the detectives reinitiated interrogation with defendant without an attorney present.

¶ 29    During the May 26 interrogation, defendant made incriminating statements. He initially said he was in the van during the shooting, but did not participate. The detectives told defendant he was lying. Defendant then told them that he was driving the van and was unaware that codefendant Robert Macias had a gun. Again the detectives told defendant he was lying. At approximately 11 p.m., defendant confessed that he was the shooter. Following the interrogation, an ASA reviewed the case and declined to press charges. Defendant was released in the early morning hours of May 27, 2007.

¶ 30    On June 2, 2007, Macias was arrested in connection with the shootings. During his interrogation, Macias gave statements incriminating defendant as the shooter. Based on this information, the police arrested defendant a second time on July 14, 2007.

¶ 31    At approximately 6:15 p.m. on July 14, 2007, defendant was again placed in an interrogation room at Area 4. One of the detectives, who also participated in defendant's initial interrogation, gave defendant his *Miranda* rights and questioned defendant as follows.

> "DETECTIVE: You're here for the same shooting death of Victor Casillas, March 19th, 30th and Karlov, right? I got to tell you what your rights are. You understand you have the right to remain silent. Do you understand that? You got to say it out loud.
>
> DEFENDANT: Yes.
>
> DETECTIVE: You understand that anything you say can and will be used against you in a court of law. You understand that?
>
> DEFENDANT: Yes.
>
> DETECTIVE: Okay. You understand that you have the right to have an attorney with you when I talk to you? Do you understand that?

DEFENDANT: Yes.

DETECTIVE: You understand that if you can't afford an attorney, the state will give you one free of charge. Do you understand that?

DEFENDANT: Yes.

DETECTIVE: Okay. You've been here before, right?

DEFENDANT: Yeah.

DETECTIVE: Okay, Uh–Robert Macias has been in here. Robert has been saying some things about you–

DEFENDANT: Um-huh.

DETECTIVE: –and we wanted to talk to you about them. You want to talk to us about that?

DEFENDANT: Not really. No.

DETECTIVE: Well, I mean, he's, you know, he's saying thing that aren't good about you. That's why we <inaudible> And basically he's saying that you were the one who produced the gun for that shooting.

DEFENDANT: Um–"

¶ 32   The detective continued to ask questions, and when he asked defendant if he had anything to say about the gun, defendant shook his head indicating no. The detective followed that and asked, "you don't know something about the gun?" Defendant answered no. A few minutes later, the detective said that he wanted to hear what defendant has "to say about it." Defendant responded that he "ain't gonna say nothing about nothing."

¶ 33   The detectives left defendant alone for about 15 minutes and returned around 6:35 p.m. Shortly after they began questioning defendant again, the following dialogue took place.

"DEFENDANT: When is the attorney going to come?

DETECTIVE: The [S]tate's [A]ttorney?

DEFENDANT: Yeah.

DETECTIVE: I got to call them. <Inaudible> talk to you.

DEFENDANT: You gotta call them again?

DETECTIVE: Yup.

DEFENDANT: I thought you said that if I said if I wanted a lawyer, that–that, uh, I don't have to talk to you or something like that.

DETECTIVE: Well, that's one of your rights that I read, yeah. Is that what–I mean–

DEFENDANT: No, I'm saying that the other thing you said that–or when she told me <inaudible> keep me here for how many hours?

DETECTIVE: We can hold you for up to 48 hours.

DEFENDANT: And that's already another 48 hours already you <inaudible> huh?

DETECTIVE: It's the same as any time. It's not up to me. Last time you walked out of here a free man. We wanted to talk to you again, because, you know, he says you're the one who gets the gun."

¶ 34   The detectives then continued to question defendant, but defendant's responses were minimal. Eventually the detectives asked defendant if he wanted to see Macias's statement, and defendant stated that he did. The detectives and defendant then left the room to view the

statement. They returned approximately 10 minutes later. Over the next 30 minutes, defendant participated in the interrogation and answered the detectives' questions. During this interrogation, defendant admitted to being the shooter on March 19, 2007. A few hours later, defendant spoke with an ASA and gave a videotaped statement in which he confessed to shooting the victims.

¶ 35    In reviewing a trial court's ruling on a motion to suppress, this court applies a *de novo* standard of review. *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001); see also *Ornelas v. United States*, 517 U.S. 690, 699 (1996). However, findings of historical fact are reviewed only for clear error and the reviewing court must give due weight to inferences drawn from those facts by the fact finder. *Ornelas*, 517 U.S. at 699. Accordingly, we will accord great deference to the trial court's factual findings, and we will reverse those findings only if they are against the manifest weight of the evidence; however, we will review *de novo* the ultimate question of the defendant's legal challenge to the denial of his motion to suppress. *Sorenson*, 196 Ill. 2d at 431. However, in this case, the trial court did not hear any live testimony, but instead viewed the recordings of defendant's interrogations. Because there was no live testimony presented and we are reviewing the same evidence the trial court reviewed, we conclude our review of the trial court's ruling on the motion to suppress is *de novo*.

¶ 36    "Where a defendant challenges the admissibility of his confession through a motion to suppress, the State has the burden of proving the confession was voluntary by a preponderance of the evidence." *People v. Braggs*, 209 Ill. 2d 492, 505 (2003) (citing 725 ILCS 5/114-11(d) (West 2000)).

¶ 37    "The concept of voluntariness includes proof that the defendant made a knowing and intelligent waiver of his privilege against self-incrimination and his right to counsel." *Id.* "To protect an individual's right not to be a witness against himself, found in both the United States and Illinois Constitutions (see U.S. Const. amend. V; Ill. Const. 1970, art. I, § 10), interrogation must cease once the individual indicates in any manner and at any time prior to or during a custodial interrogation that he wishes to remain silent [citation]." *People v. Hernandez*, 362 Ill. App. 3d 779, 785 (2005). " '[A]ny statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise.' " *Id.* (quoting *Miranda v. Arizona*, 384 U.S. 436, 474 (1966)). A defendant may invoke his or her right to silence either verbally or through nonverbal conduct that clearly indicates a desire to end questioning. *Id.* (citing *People v. Nielson*, 187 Ill. 2d 271, 287 (1999) (finding that the defendant placing his hands over his ears, turning his head, and saying, " 'nah nah nah,' " was sufficient to invoke right to remain silent)). "If verbal, the individual's demand to end the interrogation must be specific." *Id.*

¶ 38    The United States Supreme Court in *Smith v. Illinois*, 469 U.S. 91 (1984), considered whether a defendant's statements subsequent to his request for an attorney rendered the invocation ambiguous and equivocal. The Court held that "an accused's postrequest responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself. Such subsequent statements are relevant only to the distinct question of waiver." (Emphasis omitted.) *Id.* at 100. "With respect to the waiver inquiry, we accordingly have emphasized that a valid waiver 'cannot be established by showing only that [the accused] responded to further police-initiated custodial interrogation.' " *Id.* at 98 (quoting *Edwards v. Arizona*, 451 U.S. 477, 484 (1981)). While *Smith* considered subsequent statements in the context of request for counsel, this reasoning is equally applicable to a defendant's invocation

of his right to remain silent. Moreover, we find that the invocation of a right to remain silent should not be based on how an interrogator phrases his or her questions to the defendant.

¶ 39    In *Hernandez,* the defendant agreed to give a videotaped statement to an assistant State's Attorney. After the attorney outlined the defendant's *Miranda* rights, she asked, " 'Understanding these rights, do you wish to talk to us now?' " The defendant responded, " 'No, not no more.' " *Hernandez*, 362 Ill. App. 3d at 781-82. The attorney then asked, " 'Do you wish to talk to us now about what we previously spoken [*sic*] to?' " and the defendant answered, " 'Yes.' " He went on to discuss his role in a murder. The defendant filed a motion to quash his arrest and suppress evidence under several bases, but did not argue that he invoked his right to remain silent. The trial court denied the motion. *Id.* at 782-84.

¶ 40    On appeal, the defendant argued that the trial court erred in not suppressing his videotaped statement because he invoked his right to remain silent and his trial counsel was ineffective for failing to raise that basis in the motion before the trial court. The reviewing court first considered whether the defendant invoked his right to remain silent. *Id.* at 784-85.

¶ 41    The *Hernandez* court found that the defendant had invoked his right to silence when after being informed of his rights and asked if he wished to speak with the prosecutor, the defendant responded, " 'No, not no more.' " *Id.* at 785-86.

> "Though it is possible that defendant was being facetious, without the videotape it is impossible to tell. From the verbatim transcript alone, it appears that while defendant had been willing to talk to the police and prosecutor about his role in [the victim's] murder, making several incriminating statements prior to his videotaped statement, *i.e.*, to [a detective] after his arrest and to [the prosecutor] just before the videotaping began, he decided during the videotaping that he no longer wished to speak." *Id.* at 785.

¶ 42    The court found that "the language defendant used here to invoke his right to silence was clear and unequivocal, unlike language from other cases found to be too ambiguous to sufficiently do so. See *People v. Milner*, 123 Ill. App. 3d 656, 658 (1984) (holding the defendant did not trigger his right to silence when he said ' "I'm tired, I can't answer no more" '); *People v. Aldridge*, 68 Ill. App. 3d 181, 186-87 (1979) (finding the defendant did not properly invoke his right to silence when he told police ' "I think you got enough," ' ' "Okay now have you got enough," ' ' "there's nothing I want to add to it," ' and ' "you've got everything you need here now" '); *People v. Troutman*, 51 Ill. App. 3d 342, 344 (1977) (finding the defendant's comment that she was not going to make a confession was not ' "specific enough to constitute a demand that questioning cease" '); *People v. Pierce*, 223 Ill. App. 3d 423, 430-31 (1991) (no proper invocation when the defendant stated, ' "If I don't want to answer any more questions, then what happens," ' ' "You got all the stuff there right now. You don't need no more really," ' and ' "I told you, though, once that ..." '; [citation]." *Id.* at 786.

¶ 43    The court in *Hernandez* held that the defendant's response was a clear and unequivocal invocation of his right to remain silent. The court then concluded that the interrogators failed to scrupulously honor his invocation and that his trial counsel was ineffective for failing to raise the argument that the defendant invoked his right to remain silent in the trial court. *Id.* at 786-89.

¶ 44    Similar to the invocation in *Hernandez*, after giving defendant his rights, the detective told defendant that a codefendant had made statements against defendant and asked if defendant wanted to talk to the detectives about that, and defendant responded, " 'Not really. No.' " The

detective did not cease interrogation at that point, but continued to tell defendant that the codefendant has made incriminating statements about defendant and to ask questions. Moreover, defendant continued to voice his desire to remain silent. A short time later, defendant shook his head indicating no and said "no," when asked if he had anything to say about the gun. Less than three minutes later, defendant said he was not "gonna say nothing about nothing." The detective continued to question defendant, telling him that they just wanted to get his "side of the story."

¶ 45    In *People v. Brown*, 171 Ill. App. 3d 993 (1988), the defendant was being questioned by an assistant State's Attorney. The attorney outlined each of the defendant's rights and then the following dialogue occurred.

> " 'Q. All right. Understanding these rights do you wish to talk to us now?
>
> A. No.
>
> Q. Pardon me?
>
> A. I didn't understand.
>
> Q. Understanding these rights, do you wish to talk to us now?
>
> A. Well, I already told you what happened.
>
> Q. All right. After you told me before about what happened I informed you that I was going to call a court reporter and we were going to take it down in writing, is that correct?
>
> A. Yes, sir.
>
> Q. Now I've advised you of your rights. Understanding these rights do you wish to talk to us now about the incident involved on the 30th of June 1983 involving the shooting death of Renaldo [*sic*] Reyes?
>
> A. Yes.' " (Emphases omitted.) *Brown*, 171 Ill. App. 3d at 995.

¶ 46    The defendant contended on appeal that the trial court erred in denying his motion to suppress because his response of " 'No' " indicated an invocation of his right to remain silent and interrogation should have ceased. *Id.* Similar to the State's argument in the present case, the State maintained that the defendant did not invoke his right to remain silent because "defendant's 'No' answer was not a clear and unambiguous invocation of the right and, instead, his answer 'simply exhibited a misunderstanding as to the wording of the question and was properly clarified in the subsequent series of questions.' " *Id.* at 996.

¶ 47    The reviewing court rejected the State's argument that a "No" response was ambiguous. "The fact that [the defendant's] oral response was not accompanied by a stronger oral statement or physical manifestations does not make his response of 'No' any less decisive or clear. In fact, because the questioning continued without any passage of time, defendant was precluded from expanding on his response if he had any intention of doing so." *Id.* at 997.

> "We further observe that the State's assertion that defendant's response of 'No' resulted from a misunderstanding of the preceding question is merely a possible, as well as a convenient, interpretation based upon the State's own 'clarification' through a series of subsequent questions which were amenable to the possibility of manipulation of the wording of those questions to obtain the desired 'clarification.' The fact remains, however, that defendant stated he did not want to talk to the assistant State's Attorney and clearly indicated so based on his responsive 'No' to the State's corresponding question. Questioning should have ceased at that point; in order to scrupulously honor

defendant's invocation of the right, the State, instead of speculating on what it perceived to be the reason for defendant's answer, should have entertained the idea that defendant was in fact invoking his right to remain silent. Accordingly, because defendant's invocation of his right to remain silent was not scrupulously honored, we hold that his statement was inadmissible at trial." *Id.* at 998.

¶ 48    In *People v. R.C.*, 108 Ill. 2d 349 (1985), the supreme court considered whether the minor defendant's right to remain silent was violated when the police continued to question the defendant after he invoked the right. There, the defendant was taken into custody in relation to residential burglary and advised of his *Miranda* rights by a juvenile officer. After being advised of his rights, the defendant stated that he did not wish to speak with the officer. The officer responded that the defendant had that right, but he had been identified by a codefendant and the arresting officer. The officer also asked about jewelry taken during the burglary. The defendant asked if returning the jewelry would make a difference and was told only in restitution. The defendant then gave a statement admitting his participation. *Id.* at 352.

¶ 49    The supreme court found that the defendant's invocation of his right to remain silent had not been scrupulously honored. "Rather than terminating the interrogation immediately, which is what *Miranda* requires, the officer told the defendant that he had been identified. This was an obvious effort to persuade [the defendant] to make a statement." *Id.* at 354.

¶ 50    The State cites the decision in *People v. Kronenberger*, 2014 IL App (1st) 110231, to support its position that defendant did not invoke his right to remain silent. We find *Kronenberger* to be distinguishable.

¶ 51    In that case, the defendant argued on appeal that his videotaped confession should have been suppressed because he invoked his right to remain silent which the police failed to scrupulously honor. The defendant pointed to two instances during his interrogation in which he invoked his right to silence. The first occurred during an interrogation in which the defendant had been advised of his *Miranda* rights and had "at times answered the detectives' questions, at times did not answer, and at times lamented on the dire circumstances in which he now found himself." *Id.* ¶ 34. The detective asked the defendant if he wanted to keep talking to the detectives, the defendant "did not verbalize a response" and the detective urged the defendant to answer yes or no. *Id.* The detective then asked, " 'You don't want to talk to me anymore?' and 'We done talking?' to which the defendant said nothing." *Id.* The defendant argued on appeal that he shook his head in response to those questions to indicate that he was done talking. *Id.* ¶ 35.

¶ 52    The reviewing court stated that it carefully viewed the videotape multiple times and "saw that the defendant made some very slight movements of his head but even after repeated viewing, it is unclear whether he actually nodded or shook his head in response to these questions." *Id.* "We cannot conclude that the defendant's head movements clearly indicated a desire to end all questioning. It certainly did not rise to the level of an unambiguous and unequivocal invocation of the right to silence." *Id.*

¶ 53    The second instance cited by the defendant occurred approximately an hour later. The detective reentered the interrogation room and asked the defendant " 'Are you done talking to me?' " and " 'Are you done talking to all of us?' " and the defendant responded, " 'Yeah.' " *Id.* ¶ 36. The reviewing court, after viewing this portion of the videotape, concluded that "the defendant's response, without specificity, did not indicate a desire to end all questioning so as

to rise to the level of an unambiguous and unequivocal invocation of the right to silence." *Id.* ¶ 37.

¶ 54    Further, the court in *Kronenberger* found that the defendant later unambiguously invoked his right to counsel, which the police scrupulously honored, but the defendant later reinitiated the conversation and wanted to speak with the detectives. *Id.* ¶ 40.

> "Based on this evidence, we find that, even had the defendant unambiguously and unequivocally invoked his right to silence at 12:57 a.m. and 2:07 a.m., and the police failed to scrupulously honor those requests, the later invocation of his right to counsel was scrupulously honored by the police and the subsequent videotaped confession was admissible, where it was made after the defendant had been readvised of his rights and he had reinitiated conversation with the police." *Id.*

¶ 55    The circumstances in the present case differ from *Kronenberger*. The State contends that defendant's initial response of "Not really. No." was limited only to his desire to talk about Macias's statement. We disagree. This response was given immediately following the giving of *Miranda* rights and was the first question posed thereafter asking defendant if he wanted to speak with the detectives. The detectives continued to mention Macias's statement implicating defendant. Defendant makes a comment suggesting he has had issues with the Latin Kings, but the inaudible moments make it difficult to fully discern his comments. The detective then says "we want to talk to you about this thing" and asks if defendant had anything to say about the gun, to which defendant shook his head indicating no. The detective then asked, "you don't know something about the gun?" and defendant says "<inaudible> No." Further, even if defendant's initial response was unclear that he did not wish to speak with the detectives at all, his later comment that he "ain't gonna say nothing about nothing," unequivocally showed that defendant had invoked his right to remain silent.

¶ 56    While the State and the trial court characterize defendant as "engaging in the conversation with the detectives," we disagree. Our review of the videotaped interrogation disclosed in excess of 30 pauses between questions asked by the detective and any response from defendant. During the initial interrogation, defendant does not "engage" in the conversation. He was hesitant and does not make any statements implicating himself until two hours later, after the videotaped recording suggested that he left the interrogation room to view Macias's statement. We find the circumstances of this case to be more analogous to *Hernandez*, *Brown*, and *R.C.* than *Kronenberger*.

¶ 57    After viewing the videotaped interrogation and reviewing the transcript of the interrogation, we find that defendant invoked his right to remain silent and the detectives should have ceased all questioning after asking defendant if he wanted to talk to them and defendant responded, "Not really. No." This response was a clear and unequivocal response that defendant did not wish to waive his right to remain silent. See *Hernandez*, 362 Ill. App. 3d at 785-86; *Brown*, 171 Ill. App. 3d at 998; *R.C.*, 108 Ill. 2d at 352-53. Defendant's invocation was unequivocal and unambiguous and was not limited to his desire to comment on Macias's statements.

¶ 58    Since we have found that defendant properly invoked his right to silence, we turn to whether the trial court could properly consider defendant's statements that followed his invocation. "Statements made after the invocation of the right to silence are admissible only if the interrogators scrupulously honored the defendant's right to cut off questioning." *Hernandez*, 362 Ill. App. 3d at 786; see also *R.C.*, 108 Ill. 2d at 353.

"In deciding whether that right was so honored, courts should consider whether (1) the interrogator immediately halted the initial interrogation after the defendant invoked his right to remain silent; (2) a significant amount of time elapsed between the interrogations; (3) the defendant was 're-Mirandized' before the second interrogation; and (4) the second interrogation addressed a crime different from that of the first interrogation (though the fact that the same crime was discussed during both interrogations does not preclude a finding that the defendant's right to silence was scrupulously honored)." *Hernandez*, 362 Ill. App. 3d at 786 (citing *Nielson*, 187 Ill. 2d at 287).

See also *Michigan v. Mosley*, 423 U.S. 96, 103-04 (1975).

¶ 59    Here, defendant's invocation of his right to remain silent was not scrupulously honored. First, the detectives did not immediately halt interrogation. Rather, they continued to discuss codefendant Macias's statements and asked defendant for his side of the story. The supreme court in *R.C.* noted that telling the defendant he had been identified after the defendant had invoked his right to silence "was an obvious effort to persuade R.C. to make a statement." *R.C.*, 108 Ill. 2d at 354. Next, no time elapsed between defendant's invocation and the continued questioning nor was defendant given new *Miranda* warnings. Finally, the interrogation only focused on the same crime, the shootings that occurred on March 19, 2007. Since defendant's invocation of his right to remain silent was not scrupulously honored, any statements made after that point were inadmissible.

¶ 60    The same test must also be applied to determine whether defendant's later statements to an ASA were inadmissible. As we previously held, the detectives did not halt the interrogation when defendant invoked his right to remain silent. Instead, the detectives continued to interrogate defendant for another two hours until defendant confessed to being the shooter. After his confession, defendant remained in the interrogation room.

¶ 61    The ASA arrived and interviewed defendant approximately four hours after the interrogation with the detectives ended. We note that the Supreme Court in *Mosley* found that a two-hour break between questioning was a sufficient passage of time to satisfy the second prong. See *Mosley*, 423 U.S. at 104-06. When the ASA began the interview, he outlined defendant's *Miranda* rights and then engaged in questioning defendant about the shootings.

¶ 62    The State cannot satisfy the first and fourth prongs regarding the subsequent statement made to the ASA. The detectives' failure to cease interrogation once defendant invoked his right to remain silent again precludes admissibility. Further, though the fourth prong alone does not necessarily preclude a finding that an invocation was scrupulously honored, the subject of both interrogations was the March 19 shootings. The continued interrogation regarding the same crime after the detectives failed to stop interrogation shows that defendant's right to remain silent was not scrupulously honored. While the passage of time and fresh *Miranda* warnings before the ASA interview fulfill the second and third prongs, that is not sufficient to show that defendant's invocation of his right to remain silent was scrupulously honored. Accordingly, defendant's statement to ASA Sheppard was also inadmissible following defendant's invocation of his right to remain silent.

¶ 63    Since we have concluded that defendant invoked his right to remain silent and all subsequent statements were inadmissible, we need not reach the applicability of *Maryland v. Shatzer*, 559 U.S. 98 (2010), to defendant's prior request for an attorney, defendant's argument that he invoked his right to counsel, or whether defendant's confession was involuntary. We

- 13 -

reverse the trial court's denial of defendant's motion to suppress his July statements and remand for retrial.

¶ 64    Additionally, we find that there is no double jeopardy impediment to a new trial. After reviewing the record, we conclude that the evidence was sufficient to prove defendant guilty beyond a reasonable doubt. However, in our finding, we reach no conclusion as to defendant's guilt that would be binding on retrial. *People v. Naylor*, 229 Ill. 2d 584, 610-11 (2008).

¶ 65    Since we are remanding for a new trial, we need not reach defendant's argument that the trial court erred when it barred defendant from introducing his May statements to explain why he confessed. We reach defendant's remaining arguments on appeal only to the extent that the issues may recur on retrial.

¶ 66    Defendant contends that the trial court erred when it admitted prejudicial photos from a MySpace page without proper foundation or authentication. The State maintains that the photos were properly admitted as part of the police's course of investigation and were not used to establish defendant's guilt.

¶ 67    Prior to trial, defendant filed a motion to exclude evidence of MySpace photographs depicting either defendant or Casillas, based on lack of foundation and prejudice. Defendant contended that only one MySpace photograph should be admitted, a photograph of defendant in which he identified himself. He asked for all other photographs from MySpace to be barred.

¶ 68    At the hearing, trial counsel argued that "no one is going to be able to testify whose MySpace page they actually came from, or how the detectives were even allowed onto that website." Counsel asserted there was "no way to lay a foundation for this." The State conceded that it would not be able to lay a foundation as to who posted the photographs or whose MySpace page it was, but sought to admit the photographs to show the course of the police investigation. The trial court allowed the admission of two photos at trial, one of defendant with the phrase "King Little Rowdy" and one of Casillas with the writing "Little Bones ROTSK." The court found that the photographs were not prejudicial and were relevant to the police's course of investigation.

¶ 69    The photographs were admitted at trial during the testimony of Casillas's brother Antonio. As previously summarized, Antonio testified that he viewed a MySpace page and saw pictures of his brother and defendant. He said he recognized defendant as "Little Rowdy." He said he then looked through a Farragut High School yearbook and found "Little Rowdy" under defendant's name. Antonio viewed the MySpace pages with the help of his cousin because Antonio did not have a MySpace account. Antonio was given permission to use and the password for the account of a friend of Antonio's cousin. He used this account to send a friend request to "Little Rowdy." When the friend request was accepted, he was able to view photographs. Antonio testified that he approached a police officer at his brother's funeral with defendant's name. A couple days later, two detectives came to his house and Antonio showed the detectives the MySpace page.

¶ 70    Antonio was shown three photographs from the MySpace page. The first was a picture of defendant making gang signs with the caption "Lil Rowdy." The second was a photo of Casillas with a caption "Lil Bonez Rotsk," which Antonio testified meant "bragging about how [his] brother is dead." The third photo was another picture of Casillas with the caption, "Lil Bonez Rotsk!! hahaha 1 less Avers ... hahaha." Antonio stated this caption was laughing and bragging about his brother's death. Also at trial, Gonzalez testified that he identified defendant

- 14 -

in a lineup because Antonio showed him a MySpace photograph of defendant and told him to identify defendant.

¶ 71 "The admission of evidence is within the sound discretion of a trial court, and a reviewing court will not reverse the trial court absent a showing of an abuse of that discretion." *People v. Becker*, 239 Ill. 2d 215, 234 (2010). An abuse of discretion occurs where the trial court's decision is arbitrary, fanciful or unreasonable or where no reasonable person would agree with the position adopted by the trial court. *Id.*

¶ 72 "In general, the consequential steps of an investigation are relevant to explaining the State's case to a jury." *People v. Thompson*, 2014 IL App (5th) 120079, ¶ 45 (citing *People v. Johnson*, 116 Ill. 2d 13, 24 (1987)). "In particular, the State must be allowed to explain why a previously unidentified defendant became a suspect." *Id.* "Silence as to this point would leave open the question of why, of all the people in the world, the police arrested defendant." *Id.* "This would invite speculation and baseless innuendo that the investigation lacked rigor." *Id.*

¶ 73 Here, the MySpace photographs were relevant at trial to establish the course of the police investigation and how defendant was identified as a suspect. Nevertheless, defendant asserts that the photographs were not properly authenticated to be admitted at trial.

¶ 74 Under the Illinois Rules of Evidence, "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Ill. R. Evid. 901(a) (eff. Jan. 1, 2011). Rule 901(b) contains a nonexhaustive list of illustrations to authenticate a piece of evidence. One example from this list is testimony from a witness with knowledge that a matter is what it is claimed to be. Ill. R. Evid. 901(b)(1) (eff. Jan. 1, 2011).

¶ 75 Here, the MySpace photographs were admitted to show the course of the police investigation. Antonio Casillas testified about how he obtained access to the photographs from the account of a friend of his cousin. His testimony authenticated that the photographs were what they were claimed to be, something used by the police during their investigation to identify defendant as a suspect. The photographs were not used to establish defendant's guilt.

¶ 76 Defendant contends that the State did use the MySpace photographs to assert defendant's guilt. To support this contention, defendant quotes a portion of the State's closing argument in which the prosecutor made the following statements, over objection.

> "PROSECUTOR: We know that the defendant bragged about it afterwards, he bragged about killing Little Bones.
>
> DEFENSE COUNSEL: Objection, Judge.
>
> TRIAL COURT: Overruled. Ladies and gentlemen of the jury, you've heard the arguments and heard the evidence. Use your recollection.
>
> PROSECUTOR: He bragged about killing Little Bones which we know is Victor Casillas."

¶ 77 This portion of the argument does not reference MySpace or any photographs as the source of defendant bragging about the shooting. Further, as the State points out, one of the detectives testified at trial that someone known as "Little Rowdy" was bragging about the murder at Farragut High School. Since the argument does not refer to the MySpace photographs, the argument was a proper comment based on evidence at trial.

¶ 78 Further, as the State points out, in rebuttal closing argument, the prosecutor specifically discussed the relevance of the MySpace photographs:

- 15 -

"Antonio Casillas was not on trial. The defendant, as a matter of fact, isn't on trial for even being named Lil' Rowdy. He isn't on trial for being in some Farragut yearbook. He isn't on trial for having a MySpace page. He isn't on trial for posing with girls and drinking Corona. He isn't on trial for being a Latin King. He's on trial for shooting and killing Victor Casillas. He's on trial for injuring Leonel [*sic*] Medina.

The relevance of those MySpace photographs was that Antonio Casillas had those MySpace photographs. He looked at the Farragut yearbook. He got the name Oscar Flores. That information was used by police in their investigation. That information was used so that Oscar Flores's picture could be put into photo arrays.

He doesn't sit before you because he's a Latin King. Now, his actions are the reason why he sits before you. He doesn't sit before you because of that MySpace page. So the fact that there isn't a yearbook that you have to take back there, the fact that there isn't computer that you have to take back there, is totally irrelevant to the defendant's guilt in this case."

¶ 79    The prosecutor in rebuttal described the relevance of the MySpace photographs, and made it clear to the jury that the photographs were not evidence of guilt. We conclude that the trial court did not abuse its discretion in admitting the MySpace photographs for the limited purpose as part of the course of police investigation. However, the captions to the photos are prejudicial to defendant and should be redacted. It appears based upon the record before us that the State cannot prove who wrote the captions, which appear to be bragging about the victim's death, and could be attributed to defendant as a form of a confession. Although the MySpace photographs may be admitted as part of the police investigation, since the State cannot show who wrote the prejudicial captions, the captions should not be admitted at trial.

¶ 80    Finally, defendant has asserted that his trial counsel was ineffective for failing to object to evidence that defendant's photograph was in a Chicago police database and he had previously been arrested. While we do not need to reach the question of whether trial counsel was ineffective, we do observe that evidence of a mug shot is not admissible and should be avoided on retrial. "When identification is a material issue at trial, testimony relating the use of mug shots in an investigation may be introduced to show how a defendant was initially linked to the commission of an offense. However, mug shot evidence tending to inform the jury of a defendant's commission of other, unrelated criminal acts should not be admitted." *People v. Nelson*, 193 Ill. 2d 216, 224 (2000). As previously discussed, defendant's identification was linked to the MySpace photographs. Testimony relating to defendant's photograph in the police database should not be admitted.

¶ 81    Based on the foregoing reasons, we reverse the decision of the circuit court of Cook County and remand for a new trial in accordance with this decision.

¶ 82    Reversed and remanded.