2023 IL App (1st) 190364

SIXTH DIVISION
March 31, 2023

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

No. 1-19-0364

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 5242 |
| | ) | |
| MICHEAIL WARD, | ) | Honorable |
| | ) | Nicholas Ford, |
| Defendant-Appellee. | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justices Oden Johnson and Tailor concurred in the judgment and opinion.

**OPINION**

¶ 1     A jury found defendant Micheail Ward guilty of first degree murder (720 ILCS 5/9-1(a)(1)

(West 2018)) and aggravated battery with a firearm (*id.* § 12-3.05(e)(1)) and also determined that

he personally discharged a firearm that caused great bodily harm or death to another person (730

ILCS 5/5-8-1(a)(1)(d)(iii) (West 2018)). The trial court sentenced Mr. Ward to a total of 84 years

in prison. On appeal, Mr. Ward argues that (1) the evidence was insufficient to find him guilty of

the offenses beyond a reasonable doubt, (2) the trial court erred in not suppressing his custodial

statements because the detectives who interrogated him violated his right to remain silent, (3) the

trial court abused its discretion in denying his motions to admit two expert witnesses relative to

these custodial statements, (4) it was plain error for the trial court not to ask the potential jurors

whether they accepted the principles set out in Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), (5) several statements in the prosecutor's rebuttal at closing argument deprived Mr. Ward of a fair trial, (6) Mr. Ward's arrest, pursuant to an investigative alert, should have been quashed as a constitutionally unreasonable seizure, and (7) we should remand to the trial court to determine whether his 84-year *de facto* life sentence was unconstitutional as applied to him because he was 18 years old at the time of these crimes.

¶ 2      We conclude, for the following reasons, that the evidence was sufficient to support Mr. Ward's convictions. We also find that the trial court should have suppressed Mr. Ward's inculpatory statements to detectives because he clearly and unequivocally invoked his right to remain silent, that invocation was not scrupulously honored, and the error was not harmless. We therefore reverse the trial court's ruling on that motion and remand for a new trial.

¶ 3                          I. BACKGROUND

¶ 4      This case stems from the January 29, 2013, shooting of 15-year-old Hadiya Pendleton, and 17-year-olds Lawrence Sellers and Sabastian Moore. Mr. Sellers and Mr. Moore survived their injuries, but Ms. Pendleton died as a result of her wounds. Mr. Ward and his codefendant Kenneth Williams, who is not a party to this appeal, were charged with the first degree murder of Ms. Pendleton, as well as the aggravated batteries of Mr. Sellers and Mr. Moore. The State also alleged that Mr. Ward personally discharged the firearm that proximately caused Ms. Pendleton's death.

¶ 5                          A. Pretrial Motions

¶ 6      The defense moved to quash Mr. Ward's arrest and suppress any resulting evidence on October 7, 2014. The trial court denied the motion, concluding that the police had probable cause to arrest Mr. Ward.

¶ 7      On February 18, 2016, the defense also moved to suppress Mr. Ward's statements to the

police, arguing that he had invoked his right to remain silent three times, but that "his invocations were never scrupulously honored by Detectives." The trial court denied that motion. The trial court found that Mr. Ward did not invoke his right to remain silent and that his statements were not involuntary. The court made clear it had watched the recordings of Mr. Ward's interrogation and concluded that "[t]he nature of [Mr. Ward]'s actions [did] not point to an unequivocal assertion of his right to remain silent."

¶ 8 On August 28, 2017, the trial court allowed the defense to reopen the motion to suppress and present the testimony of Dr. Richard Ofshe, an expert on the "impact of interrogation methods on [a] suspect[']s decision making." After hearing Dr. Ofshe's testimony and additional argument, the court again ruled that Mr. Ward's statements were admissible.

¶ 9 Defense counsel filed pretrial motions to admit at trial Dr. Ofshe's testimony "regarding the phenomenon of false confessions," and testimony from retired detective James Trainum "regarding police procedure and interrogation methods." The trial court denied both motions.

¶ 10 B. Trial

¶ 11 The witnesses agreed that the shooting occurred at Harsh Park, at approximately 4462 South Oakenwald Avenue in Chicago. Harsh Park is bordered on the east by Oakenwald Avenue and on the west by a fence and an alley. At approximately 2:15 p.m. on January 29, 2013, a group of students from Dr. Martin Luther King Jr. College Preparatory High School (King High School) were at the park when a Black man opened fire on the group from the alley. The students ran, and three of them—Ms. Pendleton, Mr. Sellers, and Mr. Moore—were hit by gunfire.

¶ 12 1. The State's Case

¶ 13 The State introduced the testimony of nine King High School students who witnessed the shooting, another eyewitness who lived across the street from the park, and multiple law

enforcement and other witnesses who participated in the case investigation. The State also called four witnesses whom the State maintained had spoken with Mr. Ward in the days after the shooting. Each of these witnesses made statements about the events that incriminated Mr. Ward to detectives, to assistant state's attorneys (ASAs), and before the grand jury, but recanted all or part of those statements at trial. Because the sufficiency of the evidence is at issue in this case, we will describe the trial evidence in some detail.

¶ 14                                a. The King High School Students

¶ 15    The King High School students ranged in age from 15 to 18 years old at the time of the shooting. Each testified that on January 29, 2013, they had final exams and were released from school early—between 12:45 and 2 p.m. The day was unseasonably warm, and the group walked to Harsh Park to hang out and smoke marijuana. They were sheltering from the rain beneath a canopy at the park when a Black man fired a gun in their direction from the adjoining alley. The students scattered and ran to Oakenwald Avenue. The students each heard between three and six shots and gave limited and varied descriptions of the shooter. Several of the students were facing the alley when the shooting began.

¶ 16    Stephen Abdul was the only student who positively identified Mr. Ward as the shooter, though he did not become certain of that identification until trial. He identified three individuals he thought had "similar characteristics" to the shooter from the photo arrays he was shown on January 31, 2013. Those arrays did not include Mr. Ward, and Mr. Abdul told the detectives he did not see the actual shooter in the photos. Mr. Abdul testified that, on February 10, 2013, he picked Mr. Ward out of an in-person lineup as the shooter and it was "a pretty solid answer," although he was not 100% sure. Mr. Abdul also later agreed on cross-examination that he did not actually make an identification at the in-person lineup, but instead made a statement of similarity.

4

¶ 17     Mr. Abdul's testimony was that he had seen "something move" in his peripheral vision, had noticed "some image moving towards the alley," and, when he looked over, "there was a guy with a gun who raised the gun and started to shoot." Mr. Abdul said the shooter was between 5 feet, 11 inches and 6 feet, 1 inch tall, "[m]edium size," with dark skin. He also remembered "dreadlocks of some sort," a "blue top and a blue jacket" and "khaki pants, maybe cargo pants," with "a hood or a hat."

¶ 18     Mr. Abdul was shown a blue hoodie and a black and gray hat at trial. He identified the color of the hoodie as the same blue color he had seen the shooter wearing. As to the hat, he said, "I do remember a black garment on his head." On cross-examination, Mr. Abdul agreed that he told a detective on January 30, 2013, that the shooter had worn a black hat or cap over dreadlocks, in addition to having dark skin and long arms, and that Mr. Ward did not have dreadlocks. Mr. Abdul agreed that the whole thing happened very quickly; he saw the shooter as shots were being fired, and then fled from the park. Mr. Abdul also agreed that most of his friends discussed what had happened later on Facebook, that he had kept up with the case on social media, and that he had seen photos of Mr. Ward and Mr. Williams on the news.

¶ 19     Of the remaining students, some viewed both a photo array and an in-person lineup in the days after the shooting, while others viewed only an in-person lineup. Mr. Ward was not included in the photo arrays shown until February 5, 2013, but was included in all of the in-person lineups. The students viewed the arrays and lineups independently from one another and were all either unable to identify anyone from the lineups or pointed out Mr. Ward as someone who looked similar to the shooter. Three (Klyn Jones, Mr. Moore, and Mr. Sellers) were unable to make any identification, and one (Jordan Dillon) selected Mr. Ward from a photo array as looking similar to the shooter but was unable to pick him out at the lineup. Two of the students (Lazerick Bowdry

and Danetria Hutson) picked Mr. Ward from the lineup as looking similar to the shooter, and two (Kyra Caldwell and Veronica Hansberry) picked out both Mr. Ward and another individual from the lineup as looking similar to the shooter.

¶ 20                                     b. Ronald Evans

¶ 21    The only eyewitness who was not a student at King High School was Ronald Evans, a former police officer with the Chicago Police Department from 1994 to 2007. Mr. Evans was not asked to and did not identify Mr. Ward in open court. At the time of trial, Mr. Evans had been convicted in a federal case of wire fraud and money laundering (case No. 12 CR 3 0042) and for fraud and making a false statement (case No. 13 CR 3 0082). Mr. Evans maintained that he did not benefit in any way from his cooperation in this case, as the charges against him were federal and he still served time in prison.

¶ 22    On January 29, 2013, Mr. Evans lived on the third floor of a multi-unit building at 4431 South Oakenwald Avenue. At approximately 2 p.m. on that day, Mr. Evans was in his bedroom when he glanced out of the window facing Oakenwald Avenue to check the weather, which was unseasonably warm—in the 60s, and raining. He noticed "a lot" of high school students, "maybe a total of 20," walking east on 44th Place and then south on Oakenwald Avenue.

¶ 23    About 15 or 20 minutes later, Mr. Evans heard "several loud reports that [he] believed to be gunshots." He was a couple of feet from the window and had an unobstructed view of a Black teenager in the alley behind the vacant lot "running northbound with a firearm in his hand." Mr. Evans testified that the teen was wearing a blue hooded sweatshirt—describing it as "a really unique color of blue, not navy blue"—jeans, and no hat, and said the teen had a "low hair cut" with no dreads or braids. Mr. Evans then saw the teen get into a white four-door Nissan parked at the mouth of the alley at 44th Place, facing toward Mr. Evans's residence. Mr. Evans saw the teen

put the gun in the pocket of his hooded sweatshirt and get into the front passenger seat of the car, which "immediately left the scene," going east on 44th Place, then north on Oakenwald Avenue away from the park. Mr. Evans could not tell if there were others in the vehicle with the shooter and the driver. Mr. Evans's view was of the rear of the car as it drove away, and he did not notice anything distinctive about it.

¶ 24    Just after midnight on January 31, 2013, Mr. Evans went to the police station and viewed a photo array that included several Suwu gang members, including Mr. Williams, but that did not include Mr. Ward. Mr. Evans testified that one of the individuals in the array—Mr. Williams— "just grabbed [his] attention," but that man had dreadlocks or braids, unlike the teen he had seen running. Mr. Evans told detectives that the man "caught [his] eye but the shooter did not have dreads."

¶ 25    Mr. Evans was shown a blue hooded sweatshirt at trial and said it was the same color as the one the individual he had seen running from the shooting was wearing. On cross-examination, Mr. Evans agreed that he could not say for sure whether it was the actual sweatshirt the shooter had been wearing, only that it was the same color. Mr. Evans did not remember saying this, but the parties stipulated that, if called, Sergeant Kruega would testify that on January 29, 2013, Mr. Evans told him that the shooter was wearing "a light or royal blue colored jacket."

¶ 26    On February 2, 2013, a detective took Mr. Evans near Mr. Ward's home at 362 East 59th Street to see if a white four-door sedan was the vehicle in which the shooter had fled. Mr. Evans testified that the car was the same make and model, had the same number of doors, and had the same type of wheels, but there was nothing to distinguish it from another car of the same type.

¶ 27                    c. The Recanting Witnesses

¶ 28    Ernest Finner, Demetrius Tucker, Tyron Lawrence, and Jarod Randolph, individuals

7

affiliated with the Suwu gang, all initially gave statements or grand jury testimony, or both, implicating Mr. Ward as the shooter in this case but recanted in part or in full at trial.

¶ 29                                    i. Ernest Finner

¶ 30    Mr. Finner's pretrial handwritten statement was introduced at trial through testimony from George Canellis, who was a judge at the time of trial but was an ASA at the time of the investigation, and who we will refer to as ASA Canellis. His statement was that on January 29, 2013, Mr. Finner and Demetrius Tucker attended an orientation at "Ada S. McKinley School." They left school a little bit after 2 p.m. to walk to a friend's house at 41st Street and Indiana Avenue. Mr. Finner was wearing a red Bulls jacket, and Mr. Tucker was wearing a dark top. It was raining. When they were near 39th Street and Indiana Avenue, Mr. Finner heard a car horn coming from Mr. Ward's mother's car, a white car that Mr. Finner had seen and ridden in multiple times. Mr. Williams was driving, and Mr. Ward was in the front passenger seat. Mr. Ward told them to hop in, so they did. Mr. Williams was not acting like himself. He seemed "all nervous" and was "constantly looking all over the place from side to side, to the back, and in the mirror." Mr. Williams then said that he and Mr. Ward "had just done a drill"—Mr. Finner understood this to mean a shooting—involving the 4-6 Terror (a rival gang) and that he and Mr. Ward had been looking for 4-6 Terror members when they drove by the park and saw a group of people. Mr. Williams said he saw some students from King High School and was afraid they would recognize him if he did the shooting, so he and Mr. Ward switched spots and Mr. Ward did the shooting.

¶ 31    According to Mr. Finner's handwritten statement, Mr. Ward then became angry and said Mr. Williams should not be saying anything. Mr. Finner did not want to have anything to do with Mr. Ward or Mr. Williams after hearing what they had done and asked to be dropped at home. Mr. Finner identified still photographs from surveillance footage of himself and Mr. Tucker walking

8

in the rain before they got into Mr. Ward's mother's car.

¶ 32     In his statement, Mr. Finner also referenced a Suwu meeting on February 8, 2013, at which he and Mr. Ward were present. The meeting was called because of "the heat" that members of the Suwu were getting from the police about the shooting. At the meeting, Mr. Ward was upset at Mr. Williams for "running his mouth about Micheail shooting the girl." Mr. Ward told everyone at the meeting to lay low and he did not want to hear anything more about the shooting.

¶ 33     Mr. Finner noted in his statement that he had been treated fine by the police and the ASA, and that he was allowed to sit with his mother at the station. She told him to tell the truth, which he did. No threats or promises were made to him, and he gave the statement freely and voluntarily.

¶ 34     Video recordings that corroborated portions of Mr. Finner's statement were published to the jury and are included in the record on appeal. One, recorded at around 2:29 p.m. on January 29, 2013, was from a camera near 39th Street and Indiana Avenue. The video shows two individuals—one in a red jacket and one in a dark top—running toward a white vehicle on the street. During his statement, Mr. Finner viewed stills from the video and identified the white car as Mr. Ward's mother's car, himself in the red jacket, and Mr. Tucker in the dark top. The other video was from a Chicago Housing Authority (CHA) security camera at 3983 South Lake Park Avenue, recorded at approximately 2:39 p.m. on January 29, 2013. That video shows a white four-door car park and three individuals exit—from the driver's seat, the front passenger seat, and the rear passenger-side seat. The front passenger—who is wearing a dark or black t-shirt—takes the driver's seat, then drives away, while the other two individuals depart on foot. Sergeant Velma Guerrero, who interviewed Mr. Finner before he gave his statement, testified at trial that Mr. Finner identified Mr. Ward as the person who got out of the front passenger seat, Mr. Tucker as the rear passenger, and Mr. Williams as the initial driver in stills from the CHA camera.

¶ 35    A transcript of Mr. Finner's grand jury testimony was also published to the jury and was consistent with Mr. Finner's statement to ASA Canellis. Michael Delacy, formerly an investigator for the State, testified that Mr. Finner also reiterated the veracity of his prior statements at a meeting with ASA Brian Holmes on November 3, 2013, at which Mr. Delacy was also present, and Mr. Finner told ASA Holmes that he "felt fine, but he was concerned for his mother's health."

¶ 36    At trial, Mr. Finner testified that he did not remember his whereabouts on January 29 or February 8, 2013, meeting with ASA Canellis on February 10, 2013, testifying before the grand jury on February 11, 2013, or meeting ASA Holmes on November 3, 2013. Mr. Finner also said he did not remember giving a handwritten statement to ASA Canellis, but when he was shown the statement, he did agree that his signature appeared on the bottom of all 10 pages and his initials appeared next to a correction.

¶ 37    On cross-examination, Mr. Finner testified that he was on parole in 2013 and if he violated his parole, he would have to serve the remaining 1.5 years of his 3-year sentence. He said that on February 9, 2013, his parole officer told him to come in for a "drug drop," and when he arrived, he was pulled from his mother's car and put in handcuffs. Mr. Finner said the officers threatened to charge him with a "dirty drop," a violation of his parole, and said they would cause his mother to lose her job if he did not cooperate with them. He then told them what they wanted to hear.

¶ 38                                    ii. Tyron Lawrence

¶ 39    Mr. Lawrence largely adhered to his grand jury testimony, only changing his testimony at trial with respect to a few details. Mr. Lawrence testified that at approximately 2:30 p.m. on January 29, 2013, he was in a reddish vehicle with Anthony Pearson and Nurldon Green. Mr. Pearson was driving, Mr. Green was in the front passenger seat, and Mr. Lawrence was in the back seat next to a backpack. They drove to the BP gas station at 35th Street and Martin Luther King

Jr. Drive (King Drive) and pulled in. There, Mr. Lawrence got out of the car with the backpack and passed the bag to the occupants of a white car. Mr. Lawrence said Mr. Finner and someone else whose name he did not know were in the back of the car, along with Mr. Ward and Mr. Williams in the front, though he did not remember who was driving.

¶ 40 The video surveillance from the BP gas station was shown, and Mr. Lawrence identified the car he was in, the other white car that Mr. Ward and Mr. Williams were in, and the moment when he passed the bag over to the white car. Mr. Lawrence said he did not recognize the white car and did not agree that it belonged to Mr. Ward's mother.

¶ 41 Mr. Lawrence agreed that on February 26, 2013, he was picked up by Detective John Halloran and shown both a video of him rapping, "Scary Movie," and video footage from the BP gas station. The Scary Movie video was published to the jury. Mr. Lawrence identified himself in the video doing an "upside-down signal," a gang symbol for "4-6K," a rival gang of Suwu. Mr. Lawrence identified Mr. Ward, Mr. Williams, and Jarod Randolph—who had a revolver—in the video. At the time, Mr. Lawrence was on probation for a drug case he had picked up in 2011 and maintained that the detectives who questioned him threatened to charge him with "[a]ssocation to murder" if he did not cooperate. They wanted to know what was in the bag that he passed to the white car, but he said there was nothing in the bag. Mr. Lawrence understood that he had to tell the detectives the truth because they had him on video. He said he was questioned for about 18 hours, was not fed, and then was taken directly to testify before the grand jury.

¶ 42 Jennifer Sexton, formerly an ASA, testified that Mr. Lawrence told the grand jury that he recognized the white car as "[Mr. Ward]'s mother's car," that he saw Mr. Finner and Mr. Tucker—whom he identified by name before the grand jury—in the backseat, and that Mr. Williams was driving.

11

¶ 43                                    iii. Demetrius Tucker

¶ 44    Mr. Tucker's handwritten statement, which was presented to the jury by ASA Canellis, was that he got into the back of Mr. Ward's car, and that Mr. Williams was driving while Mr. Ward was in the front passenger seat. Mr. Tucker said that Mr. Williams was acting strange, kept looking around a lot, and then said they had just done a drill, which Mr. Tucker knew meant a 4-6 Terror shooting. Mr. Tucker said Mr. Ward also said they had done a drill.

¶ 45    Mr. Tucker testified before the grand jury, and his grand jury testimony was consistent with his handwritten statement. Mr. Tucker also agreed before the grand jury that he had been treated well, had not been threatened or promised anything, and had spoken to the police and ASA Canellis freely and voluntarily.

¶ 46    At trial, Mr. Tucker testified that he could not recall who was driving the white Nissan when he was picked up, and that "no one said a word" while they were all in the car. Mr. Tucker agreed he spoke with ASA Canellis, but denied saying anything about the murder. Mr. Tucker was shown the statement he gave to ASA Canellis, but said he did not recognize it and denied much of the statement, though he agreed he had signed the document on each page. Mr. Tucker said he was not allowed to review his statement or make corrections, he did not give his statement freely or voluntarily, and he told ASA Canellis that he was not treated fine by the police.

¶ 47    On cross-examination, Mr. Tucker agreed he told defense counsel that the police told him that "if [he] d[idn't] tell them what happened [he] w[ould] get ten years added to the time that [he was] already on probation for." When Mr. Tucker continued to deny having any knowledge about the shooting, the police officers told him to say that Mr. Williams did a drill.

¶ 48                                    iv. Jarod Randolph

¶ 49    Mr. Randolph's grand jury testimony was presented at trial by former ASA Sexton. Mr.

Randolph told the grand jury that he received a phone call from Mr. Ward on January 30, 2013, and Mr. Ward told him that "a little girl got killed on [4-6]. Him and Kenny went through. He popped out." Mr. Randolph said he knew Mr. Ward was talking about Ms. Pendleton and that "popped out" meant that he "jumped out of the car shooting." Mr. Randolph told Mr. Ward they could not talk about it on the phone and hung up. Mr. Randolph said he discussed Ms. Pendleton's murder again with Mr. Ward in person on January 31, 2013. Mr. Ward "explained how he feel bogus as hell. He wish I would never did it. He regret it. Things like that." Mr. Randolph said he spoke with Mr. Ward again on February 1, 2013, and Mr. Ward said the "exact same thing he said the day before"—"how much he regret, he remorseful, wished he would have never done it, how sorry he was." Mr. Randolph said that the Suwu had a meeting on February 8, 2013, and that Mr. Ward was at the meeting, but Mr. Williams was not. At the meeting, they discussed that someone was "talking about the murder [of Ms. Pendleton] a lot," and that "nothing needed to be said about it. Phones or in person. Period."

¶ 50    At trial, Mr. Randolph testified that he did not remember speaking with Mr. Ward between January 30 and February 8, 2013, meeting with the police and an ASA on February 26, 2013, or testifying before the grand jury.

¶ 51    On cross-examination, Mr. Randolph said he did not recall being on parole in February 2013, but agreed that he would not want to get in trouble while on parole because that would require him to return to prison. He insisted he never made a rap video and did not recall the police showing him the "Scary Movie" video. When the video was played for him at trial, Mr. Randolph said he remembered the video but did not remember being shown the video by the police. Mr. Randolph testified that he did not recall telling an investigator for the defense named Brad Thompson in May 2014 that "because there was a music video he appeared in with a gun the police

13

were using that to threaten to violate his parole or charge him on a new case," or, as Mr. Thompson later testified, that "[he] gave [the police] the statement because he was told *** he would be violated for parole if he didn't tell them what they wanted to hear." Mr. Randolph invoked his right to remain silent when asked if a portion of the video showed him with a gun in his hand.

¶ 52                    d. Law Enforcement Witnesses and Forensic Evidence

¶ 53    Law enforcement personnel and forensic experts provided extensive testimony regarding the investigation of the January 29, 2013, shooting. That testimony is summarized here to the extent necessary to assess the sufficiency of the evidence.

¶ 54    The assistant medical examiner who completed Ms. Pendleton's autopsy testified that the cause of her death was a gunshot wound to her back and the manner of death was homicide.

¶ 55    Sergeant Jose Lopez, an expert in criminal street gang investigations and a member of the department's gang intelligence unit, was early to the scene. He knew that Harsh Park was 4-6 Terror territory. When he learned that the offender had fled north from the scene, in the direction of the rival Suwu gang's territory, a gang shooting became law enforcement's theory of the case. Sergeant Lopez explained that 4-6 Terror was Suwu's most significant rival at the time, although Suwu was also "at odds with So Icy Boys to the south." Sergeant Lopez testified that there had been shootings between Suwu and 4-6 Terror in the time leading up to the shooting in this case. He told the jury that in July 2012, Mr. Williams had been the victim of a shooting. A member of 4-6 Terror was identified as a suspect, but was never charged because Mr. Williams would not cooperate with police. In September 2012, a Suwu member named Dejuan Jackson was murdered, and the suspect identified was also a 4-6 Terror member.

¶ 56    Sergeant Lopez explained that gangs use social media, including YouTube, "quite a bit," and that disrespect can be shown to a rival gang through lyrics or by showing a rival gang's hand

14

sign upside down.

¶ 57    On cross-examination, Sergeant Lopez disagreed that he had concluded that Suwu must be involved in the shooting based only on the fact that the shooter fled north. He maintained, however, that it was his experience "that once offenders do a shooting, you take the most direct route back to your own territory." Sergeant Lopez acknowledged that 4-6 Terror also had problems with the Young Money street gang but said that all the evidence the police compiled had led to Suwu.

¶ 58    Detective Abdalia Abuzanat, who was an evidence technician in 2013, testified that no cartridge casings or fired bullets were found at the scene and that this was "consistent with a firearm being a revolver," which does not eject cartridges when fired.

¶ 59    Sergeant Guerrero testified that a database search for white Nissans in the area of the murder indicated that a 2012 hard-top, four-door, Nissan Sentra was pulled over in the early morning hours of January 27, 2013, and that Mr. Ward was the driver. The officer who initiated that stop noted that Mr. Ward was 18 years old, 5 feet, 8 inches tall, 163 pounds with a medium build, brown eyes, short hair, and a dark complexion.

¶ 60    Chicago police officer Kevin Kilroy testified that he arrested Mr. Ward at approximately 11:55 p.m. on February 9, 2013. Mr. Ward was pulled over around 6600 South King Drive while driving his mother's white Nissan. Officer Kilroy searched Mr. Ward, who was wearing a blue sweatshirt at the time of his arrest, and recovered Mr. Ward's cell phone, eventually turning it over to an investigating detective. Mr. Ward's car was not searched at that time but was impounded and inventoried. Mr. Williams was also arrested at the same time and location, though he had been the passenger in a different vehicle. Mr. Williams's cell phone was also recovered at that time.

¶ 61    Mary Wong, a forensic scientist, analyzed the gunshot residue (GSR) test kits received from the front of Mr. Ward's mother's car and did not get a positive result. Ms. Wong said this

might be explained by a shooting having occurred outside the car. The washing of hands and wiping of surfaces or the passage of 10 days could also contribute to a negative finding. On cross-examination, Ms. Wong testified that GSR can be identified on clothing, but she was not consulted about testing clothing in this case. And while GSR can also be identified on a shooter's hands, she explained that there is only a "six hour window" for such tests.

¶ 62 Joseph Raschke, a special agent with the FBI and a member of its cellular analysis team, was qualified as an expert in historical cell site analysis. He explained that cell site analysis was not a science, that the "cell tower used can only be seen if a call is made or received," and that while "[m]ost of the time," service is provided by the closest cell site, that does not necessarily happen every time. Agent Raschke testified that Mr. Williams's phone showed calls made at 2:19 and 2:20 p.m. on January 29, 2013, using a cell site that "provide[d] coverage to the crime area." At 3:33 p.m., Mr. Williams's cell phone made a call to Mr. Ward's phone, hitting off the cell tower closest to the crime scene, but then hit a cell site a couple of miles away during a call at 3:36 p.m.

¶ 63 Mr. Ward's phone showed several calls made between 2:01 and 2:07 p.m. that hit off two different towers, located near 39th Street and King Drive and 47th Street and King Drive, which Agent Raschke said indicated a presence between the two but "likely closer" to the 39th Street tower. The phone showed no activity until 2:30 and 2:31 p.m., hitting off a cell tower with a sector encompassing the BP gas station at 352 East 35th Street. The next several calls from Mr. Ward's phone occurred from 2:54 through 2:57 p.m. and hit off the initial two overlapping towers. Finally, multiple calls from Mr. Ward's phone from between 3:00 and 3:33 p.m. used a tower that encompassed Mr. Ward's residence.

¶ 64                    e. The Interrogation and Mr. Ward's Statements

¶ 65 The State called two of the detectives who questioned Mr. Ward after his arrest. Detective

Halloran interrogated Mr. Ward with a partner in the earlier morning hours of February 10, 2013, between approximately midnight and 7 a.m. Detective Scott Reiff interrogated him on the afternoon of February 10, 2013. Video recordings of those interactions were published to the jury. It was during Detective Reiff's interview that Mr. Ward gave his incriminatory statements, a recording of which was likewise published to the jury. In addition, a transcript of the entire interrogation was entered into evidence. We have reviewed both the recording and the transcript and summarize Mr. Ward's statements to the detectives as follows.

¶ 66     During the last interrogation, before giving his statements, Mr. Ward said, "[i]t's hard." When asked what was hard, he responded, "it ain't no point in sayin' nothin' 'cause even if—even if I was never—even if I didn't do it I—and I still in this predicament. I'm still getting' a honey years." At some time before he gave his statements, Mr. Ward discussed the relationship between Suwu and 4-6 Terror, and then the murder of Dejuan Jackson, saying, "[t]hat was the final straw. It was over with. *** I loved that boy and they killed him. They shot him in the head." Mr. Ward said, "[t]hat s*** hurted—hurted me to a point where everybody had to go, but not that girl though. That girl had nothin' to do with it. She was just there." Mr. Ward said he and Mr. Williams were together in his mother's Nissan Sentra, and he was driving. Mr. Williams had the gun, but when asked what kind, Mr. Ward said, "I don't know what kind of gun it is." As the detectives asked more about the gun, Mr. Ward said, he "knew a revolver" and "[i]t wasn't a revolver." Later he said, "I honestly don't know what type of gun it was, I really don't." Mr. Ward also said that he "didn't see no [*sic*] shell cases."

¶ 67     Mr. Ward said they drove by the park and there "[w]asn't just no King kids. They was deep as f*** in that park. Like thirty of they [*sic*] ass out there." Mr. Ward said as they were driving, they saw "Zac," a member of 4-6 Terror. Mr. Ward said he parked the car at 45th Street and

Greenwood Avenue. Mr. Williams did not want to do the shooting because he said his arm was "f*** up" from when he had been shot. Mr. Ward said he did not want to do it either, but Mr. Williams told Mr. Ward that he "was dead" if he did not do it. Mr. Williams got into the driver's seat and gave Mr. Ward the gun. Mr. Ward did not have to walk far, and when asked if there was a fence, said, "I ain't [*sic*] need to get close to the fence." Mr. Ward saw Zac "[a]nd like four other boys and it was like they separate from the crowd." Mr. Ward agreed he was trying to shoot Zac and said "as they runnin' off they—they grab a girl and they threw her in front and she got shot." Mr. Ward said Zac threw Ms. Pendleton. Mr. Ward said he fired the gun six times. Then Mr. Ward ran back to the car, he gave the gun back to Mr. Williams, and they drove off.

¶ 68     At some point they drove somewhere so Mr. Williams could pick up his book bag "right before we pick Ernest and them up"—someone "handed it to him." Mr. Ward said they then picked up Mr. Finner and Mr. Tucker, and Mr. Williams "get to tellin' everybody." When asked what was said, Mr. Ward said, "[w]asn't nothin' really said." Mr. Ward said that they then went to the gas station on 35th Street and King Drive. He got gas, they dropped off Mr. Finner, and then he dropped off Mr. Tucker and Mr. Williams at Lake Park Avenue and 39th Street. Mr. Ward said he was not a member of Suwu: "I am Lake Park, we[']re not Suwu.*** I'm not Suwu. I don't gang bang, it's not what I was raised to do."

¶ 69     Detective Reiff testified that the mention of the BP gas station was the first time the detectives had heard of that. A number of details Mr. Ward had provided did not fit with what the police had learned, however. Detective Reiff agreed that no one indicated there were gang members in the park or that someone named "Zac," "Delfo," or "Deandre" was present, and that no one said that Ms. Pendleton was used as a shield, that there were 30 members of 4-6 Terror in the park, or that four outsiders rushed toward the group as they sat under the canopy. On redirect

18

examination, however, Detective Reiff agreed that the facts that Mr. Ward got "wrong" in his statements were ones that would tend to mitigate his involvement in the crime. Detective Reiff also agreed that a revolver might have been used in the shooting because no shell casings were found at the scene. Although Mr. Ward said it was not a revolver, Detective Reiff pointed out that "he was very unsure about what the gun was."

¶ 70    The State then rested, and the defense motion for a directed verdict was denied.

¶ 71                                  2. The Defense Case

¶ 72                                  a. Dr. Geoffrey Loftus

¶ 73    The defense first called Dr. Geoffrey Loftus, an expert in the field of human perception and memory. Dr. Loftus testified that he had been conducting research since the 1960s, primarily on human perception and memory. Dr. Loftus explained that any perceived event presents a vast amount of information, while a person's memory contains a "sparse" amount of information in comparison. In addition, "there are other factors at work *** that limit what information about the event you're going to get into your memory." He testified that witnesses also "can and do supplement their original memory via conscious experience with post[-]event information," which "allows them to plug the gaps in their original memory," to "fill the holes" and to "sort of create a better story, a better picture in their memory of what it was that happened during this original event." He classified post-event information as "dubious" because it is unclear whether such information is accurate or inaccurate. Dr. Loftus testified that, generally, a person ends up with a single memory and cannot distinguish "between the information they got via conscious experience and the information they got post[-]event." Dr. Loftus said that post-event information can come from talking to friends, from interviewers, from just trying to think things through, from reading about the event in the news media, and from overhearing other witnesses talking.

¶ 74    Dr. Loftus discussed several factors that could affect a witness's memory: (1) "weapon focus," meaning that "when there is a weapon in the scene, people tend to pay attention to it compared to if there's a benign object," (2) functional duration, which means the actual amount of time a person has to pay attention to information that might be relevant later on and (3) the amount of stress, with high stress potentially diminishing a person's ability to remember.

¶ 75                    b. Law Enforcement Witnesses and Forensic Evidence

¶ 76    Officer Eric Szwed, a forensic investigator with the Chicago Police Department, said he was one of the officers assigned to process the white Nissan Sentra in this case in February 2013. He and his team photographed the car, which Officer Szwed testified had lettering at the top of the back windshield. They also searched for firearms evidence in the vehicle but did not discover any.

¶ 77    Detective Salvador Esparza testified that, on February 1, 2013, he was assigned to run two names—Micheail Ward and Kenny Williams—through the contact card database to see if either individual had been stopped in a white vehicle. The contact card for Mr. Ward was produced. Detective Esparza never ran an open search for white vehicles in the area of Harsh Park and was not asked to search for any other names.

¶ 78    Brad Thompson testified that he was a private investigator hired by the defense to interview Jarod Randolph. Mr. Randolph failed to keep three appointments with Mr. Thompson, but eventually did meet with him in May 2014. Mr. Randolph told him that the police threatened him with a parole violation for appearing in a music video with a gun and that "he gave the statement to the police because he was told his parole would be violated if he didn't tell them what they wanted to hear." Mr. Thompson also agreed that Mr. Randolph said, "the police had a story they wanted to hear and [Mr. Randolph] repeated what the police or the prosecutor told him."

¶ 79    Beau Bradshaw, an investigator for the Cook County Public Defender's Office, testified

that he took pictures in 2018 of 45th Street and Greenwood Avenue, where Mr. Ward said in his statement that Mr. Williams dropped him off on the day of the shooting, and Harsh Park was about three or four blocks away from that intersection, while Kennicott Park was one block away.

¶ 80                                    3. Verdict and Sentencing

¶ 81    The jury found Mr. Ward guilty of first degree murder and found that he had personally discharged a firearm that proximately caused the death of another. The jury also found Mr. Ward guilty of aggravated battery. The trial court denied his motion for a new trial.

¶ 82    At sentencing, the trial court indicated it had considered all the factors in aggravation and mitigation, including that Mr. Ward was "young," and sentenced him to a total of 84 years in prison—70 years for the murder (45 years, plus a 25 year firearm enhancement) to be served consecutively with a 14-year sentence for the aggravated battery. Mr. Ward's motion to reconsider his sentence was denied, and this appeal followed.

¶ 83                                    II. JURISDICTION

¶ 84    Mr. Ward's motion to reconsider his sentence was denied on January 14, 2019, and he timely filed his notice of appeal that same day. We have jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 (eff. Feb. 6, 2013) and 606 (eff. Dec. 11, 2014), governing appeals from final judgments of conviction in criminal cases.

¶ 85                                    III. ANALYSIS

¶ 86    For the reasons set out in this opinion, we conclude that Mr. Ward clearly and unequivocally invoked his right to remain silent and the custodial statements he gave to detectives were therefore improperly admitted at his trial. But double jeopardy bars retrial if the evidence was not sufficient, so we first address Mr. Ward's argument that the evidence was insufficient.

¶ 87                          A. Sufficiency of the Evidence

¶ 88    "Where the evidence presented at trial, including the erroneously admitted evidence, was sufficient to support [the] defendant's conviction, retrial is not barred by double jeopardy." *People v. Brown*, 363 Ill. App. 3d 838, 850-51 (2005). Mr. Ward argues that the evidence was insufficient to find him guilty of the offenses beyond a reasonable doubt because the students' identifications of him, the recanted statements, and Mr. Ward's own statements were all unreliable and because there was no forensic evidence tying Mr. Ward to the shooting. For the following reasons, we find that the evidence was sufficient to support Mr. Ward's convictions.

¶ 89    "The State has the burden of proving beyond a reasonable doubt each element of an offense." *People v. Gray*, 2017 IL 120958, ¶ 35 (citing *Jackson v. Virginia*, 443 U.S. 307, 315-16 (1979), and *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009)). "When the sufficiency of the evidence supporting a criminal conviction is challenged, '[t]he relevant inquiry is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *People v. Ramos*, 2020 IL App (1st) 170929, ¶ 57 (quoting *People v. Ward*, 215 Ill. 2d 317, 322 (2005)). The role of the reviewing court is not to retry the defendant. *Gray*, 2017 IL 120958, ¶ 35. Instead, "it is the responsibility of the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts." *Id.* Therefore, "on questions involving the weight of the evidence or the credibility of the witnesses," we defer to the findings of the trier of fact, and we will find that the evidence was insufficient to support the conviction only if it was "so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *Id.*

¶ 90    Mr. Ward spends much of his brief arguing that, when considered in light of the factors set

forth by the United States Supreme Court in *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972), the students' "identifications" of him were insufficiently reliable to support his convictions. Only one the students—Mr. Abdul—positively identified Mr. Ward as the shooter. Mr. Abdul's in-court identification was undermined by his statements prior to trial that he was not 100% positive of his identification and by his admission that he saw pictures of Mr. Ward in the news prior to the trial. But even without any of the students' testimony, the evidence was sufficient to support Mr. Ward's convictions. Viewed in the light most favorable to the State, the remaining evidence includes (1) the testimony of Mr. Evans, (2) the testimony and prior inconsistent statements of the recanting witnesses—Mr. Finner, Mr. Tucker, Mr. Lawrence, and Mr. Randolph, (3) Mr. Ward's custodial statements, (4) video-recorded footage corroborating the statements, and (5) the historical cell site analysis testimony.

¶ 91 Mr. Evans testified that he saw the shooter—wearing a blue jacket the same color as the one recovered from Mr. Ward—get into a car of the same make and model as Mr. Ward's mother's car. In their trial testimony and prior statements, Mr. Finner and Mr. Tucker said that Mr. Williams and Mr. Ward picked them up shortly after the time of the shooting in Mr. Ward's mother's white Nissan, and that Mr. Williams said they had "done a drill" and Mr. Ward had done the shooting. Mr. Lawrence testified that he saw Mr. Williams, Mr. Ward, Mr. Finner, and Mr. Tucker in Mr. Ward's mother's car shortly after the time of the shooting at a gas station at 35th Street and King Drive. Mr. Randolph told the grand jury that in multiple conversations with Mr. Ward in the days after the shooting, Mr. Ward expressed regret and remorse at committing the shooting. Mr. Ward himself confessed to the shooting, mentioned picking up Mr. Finner and Mr. Tucker, said he stopped at the gas station, and mentioned Mr. Williams getting his backpack. The State published video recordings corroborating a number of details from these accounts, including that (1) Mr.

Finner and Mr. Tucker were picked up at 2:29 p.m. in Mr. Ward's mother's car, (2) Mr. Ward's mother's car was at the gas station at 2:34 p.m., and (3) Mr. Williams parked Mr. Ward's mother's car near 39th Street and Lake Park Avenue at 2:39 p.m. when Mr. Ward exited the front passenger seat and got into the driver's seat of the car. Finally, the State's historical cell site analysis expert testified that the cell sites that Mr. Williams's and Mr. Ward's phone hit off between approximately 2:00 and 3:30 p.m. were consistent with this evidence as to where they were at those times.

¶ 92    Although it is partly circumstantial, considering all the above evidence, we certainly cannot say that no rational trier of fact could have found Mr. Ward guilty of the offenses beyond a reasonable doubt.

¶ 93    Mr. Ward argues that the statements of the recanting witnesses were "unworthy of belief" because each of the four men was on probation or parole at the time, and thus had a reason to lie to assist the police, and all except Mr. Randolph testified at trial that they were threatened with probation or parole violations when they gave their prior statements. But a recanted prior inconsistent statement alone can support a conviction, "even without corroborating evidence." *People v. Cox*, 377 Ill. App. 3d 690, 700 (2007). It is for the trier of fact to resolve conflicts and weigh the evidence. *People v. Armstrong*, 2013 IL App (3d) 110388, ¶ 26. And when it comes to recanted statements, the trier of fact must "weigh the statement, weigh the disavowal and determine which is to be believed." *Id.* ¶¶ 26-27.

¶ 94    Here, the recanted statements were not only consistent with each other but were corroborated in part by video footage. Each of the four recanting witnesses belonged to the same gang to which Mr. Ward was alleged to belong, and, looking at the evidence in the light most favorable to the State, as we are required to do, a reasonable inference could be drawn that they recanted at trial because they did not want to testify in court against a fellow gang member. Most

importantly, the jury heard each of the recanting witnesses' live testimony and were made aware of all the reasons to doubt the veracity of their prior statements during cross-examination. The jury, by its verdict, appears to have believed the prior statements over the recantations, and we "may only disturb the jury's finding as to credibility when the evidence is so improbable or unsatisfactory as to raise a reasonable doubt of guilt." *People v. Dempsey*, 242 Ill. App. 3d 568, 586 (1993). That is simply not the case here.

¶ 95    Mr. Ward also argues that his own custodial statements are unworthy of belief. Mr. Ward contends that his statements resulted from coercive interrogation tactics known to produce false confessions, citing a journal article about these tactics. See Wyatt Kozinski, *The Reid Interrogation Technique & False Confessions: A Time for Change*, 16 Seattle J. For Soc. Just. 301 (2018). However, counsel questioned the detectives about these techniques on cross-examination, the detectives acknowledged much of what occurred, and the jury viewed the interrogation recordings. Mr. Ward's statements did include many details that were inconsistent with the other evidence— that he was dropped off at 45th Street and Greenwood Avenue, that the park was full of 4-6 Terror members, and that Ms. Pendleton was used as a shield. Nonetheless, the jury heard Mr. Ward's statements and heard the testimony of two of the interrogating detectives. Mr. Ward's trial counsel questioned the detectives about the way they treated Mr. Ward on cross-examination, and the jurors saw for themselves the video recordings of those encounters. Counsel also drew out during cross-examination every detail Mr. Ward provided in his statements that did not match other evidence. It is true, as Mr. Ward argues in his brief, that a defendant's statement need not be believed if it is contradicted by other evidence. *People v. Wiley*, 205 Ill. 2d 212, 227 (2001). But it is for the jury to weigh the credibility of a defendant's confession. *People v. Pecoraro*, 144 Ill. 2d 1, 11 (1991). Here, the jury weighed the evidence surrounding Mr. Ward's statements, including

the reasons to disbelieve them, and still found him guilty beyond a reasonable doubt. We do not find this so unreasonable or improbable that we would conclude the evidence presented was insufficient to support the jury's findings of guilt.

¶ 96    In short, the evidence was sufficient to sustain Mr. Ward's convictions, and there is no double jeopardy bar to retrial.

¶ 97                    B. The Use of Mr. Ward's Custodial Statements

¶ 98    We turn now to Mr. Ward's claim that the statements he made to the police were obtained in violation of his right to remain silent. After each of the three times Mr. Ward alleges he invoked his right to silence, the detectives took a break but then eventually resumed questioning him. After being held for approximately 12 hours, Mr. Ward ultimately made several inculpatory statements to a second team of detectives.

¶ 99    This court generally applies a two-part standard of review when examining a trial court's ruling on a motion to suppress; we review a trial court's findings of fact for clear error but review *de novo* the trial court's ultimate legal ruling as to whether suppression was required. *People v. Lance*, 2021 IL App (1st) 181665, ¶ 27 (citing *People v. Ludemann*, 222 Ill. 2d 530, 542 (2006)). Here, however—except for Dr. Ofshe's expert testimony, presented by the defendant at the hearing on the reopened motion to suppress, about the impact of interrogations on a suspect's decision making—there was no live testimony heard on the motion. Instead, the trial court based its decision on the recordings of Mr. Ward's interrogation and listened to argument of counsel. As we concluded in *Flores*, because we are essentially reviewing the same evidence as the trial court, our review is *de novo*. *People v. Flores*, 2014 IL App (1st) 121786, ¶ 35.

¶ 100   When a defendant moves to suppress his statements to the police, " 'the State has the burden of proving the confession was voluntary by a preponderance of the evidence.' " *Id.* ¶ 36

(quoting *People v. Braggs*, 209 Ill. 2d 492, 505 (2003)). Mr. Ward contends that his statements were not voluntary based on the detectives' alleged violation of his right to remain silent.

¶ 101   Both the United States and Illinois Constitutions include the right to not be a witness against oneself. See U.S. Const., amend. V; Ill. Const. 1970 art. I, § 10. In order to protect that right, "interrogation must cease once the individual indicates in any manner and at any time prior to or during a custodial interrogation that he wishes to remain silent." (Internal quotation marks omitted.) *Flores*, 2014 IL App (1st) 121786, ¶ 37. A statement taken after an individual invokes the right to silence " 'cannot be other than the product of compulsion, subtle or otherwise.' " *People v. Hernandez*, 362 Ill. App. 3d 779, 785 (2005) (quoting *Miranda v. Arizona*, 384 U.S. 436, 474 (1966)). "A defendant may invoke his or her right to silence either verbally or through nonverbal conduct that clearly indicates a desire to end questioning." *Flores*, 2014 IL App (1st) 121786, ¶ 37. But if the defendant makes a verbal invocation, the "demand to end the interrogation must be specific." (Internal quotation marks omitted.) *Id.*

¶ 102   Mr. Ward maintains that he invoked his right to silence three times: at 1:41 a.m., when he said, "I ain't got nothin' else to say"; at 4:03 a.m., when he said he "[g]ot nothin' to say"; and at 7:17 a.m., when he said, "don't want to say nothing else about it." Both the recording and the transcript of the interrogation, which differ in some respects as noted below, are included in the record on appeal. We have reviewed them both and find that they provide the following context for these three statements.

¶ 103   Mr. Ward was placed in the interrogation room at around 12:22 a.m. on February 10, 2013, and two detectives—Detectives Halloran and Murray—began questioning him at 12:34 a.m. Detective Halloran said that they were there to discuss the January 29 shooting, then gave Mr. Ward the warnings required by *Miranda*, 384 U.S. 436, which included advising him that he had

the right to remain silent. When asked whether he understood, Mr. Ward said he did. Detective Halloran said, "understanding these things, do you want to answer some questions we have for you concerning the shooting we're investigating?" Mr. Ward responded, "yes sir."

¶ 104   Detective Halloran then explained that Mr. Ward's name came up during the detectives' investigation, and they wanted to speak with him. The detectives questioned Mr. Ward about the crime, doing most of the talking, sometimes yelling more than talking. Mr. Ward maintained that he was not involved in the shooting. At 1:41 a.m., the following exchange occurred:

> "[DETECTIVE HALLORAN]: You think you have nowhere to go because we've already thrown at you we know you're the shooter and you really don't have. [*sic*] You can't turn around and say, yeah, but Kenny was the shooter. Yeah, I was there but I was drivin' and Kenny was the shooter. You really can't do that. You can explain why you were the shooter.
>
> [MR. WARD]: I ain't got nothin' else to say.
>
> [DETECTIVE HALLORAN]: You want to take a break?
>
> [MR. WARD]: [no response]
>
> [DETECTIVE HALLORAN]: You can take a break.
>
> [MR. WARD]: [no response]
>
> [DETECTIVE HALLORAN]: You don't want to talk to me, you don't have to talk to me. You got nothin' else to say?
>
> [MR. WARD]: [no response]
>
> [DETECTIVE HALLROAN]: Alright, man."

Our notations of Mr. Ward's lack of response come from our viewing of the recording and not from the transcript, which includes only dialogue and not a failure to respond.

¶ 105    The detectives left the room and did not begin questioning Mr. Ward again until 3:17 a.m. Mr. Ward again maintained he was not at the park where the shooting occurred. Then, after approximately 46 minutes, at 4:03 a.m., the following exchange occurred:

"[DETECTIVE HALLORAN]: Why'd this happen? Why'd this happen? This time, that day, that park—why did it happen?

[MR. WARD]: Got nothin' to say.

[DETECTIVE HALLORAN]: You got nothin' to say? All right, we'll take a break, all right."

¶ 106    The detectives again left the room and Mr. Ward slept on the floor of the interrogation room until approximately 7:02 a.m., when he was taken out of the room for fingerprinting. The detectives returned to the room with Mr. Ward at 7:17 a.m., and the following exchange occurred:

"[DETECTIVE HALLORAN]: You went to sleep. All right, well now that you're awake and you see you're being processed for this murder any thoughts? Still gonna try to lie your way out of it?

[DETECTIVE MURRAY]: [inaudible] it's real simple. If you don't want to say nothin' about it, if you don't want to say nothin' about it then just tell us I'm done talkin'. Okay, that's fine, all right. Just so we don't have to keep comin' in here and botherin' you.

[MR. WARD]: (inaudible)

[DETECTIVE HALLORAN]: Can't hear you.

[MR. WARD]: (inaudible)

[DETECTIVE HALLORAN]: You don't want to talk about it. Okay, alright man."

At that point the detectives again left the room and these two detectives did not question Mr. Ward any further.

¶ 107   Mr. Ward says in his brief that, in response to the detective saying, "[c]an't hear you," he said, "I don't want to say nothing else about it." The State disputes this because the record does "not indicate the nature of his response." We note that what Detective Halloran said next suggests that Mr. Ward's claim about his own response is accurate. Nevertheless, because we are not relying on just this last statement, but rather all of the statements together, we need not make any determination as to exactly what Mr. Ward said that caused the detectives to leave the room at the end of the 7:17 a.m. exchange.

¶ 108   As noted, after that exchange, Detectives Halloran and Murray did not resume questioning Mr. Ward. At approximately 12:31 p.m., Detective Reiff and his partner resumed the interrogation without re-Mirandizing Mr. Ward. And it was during this final interrogation that Mr. Ward gave his inculpatory statements.

¶ 109   In support of his argument that those statements should have been suppressed, Mr. Ward cites several cases in which the court found a defendant had invoked his right to silence, including *Flores*, 2014 IL App (1st) 121786, and *People v. R.C.*, 108 Ill. 2d 349, 352 (1985). In *Flores*, just after the defendant was Mirandized and indicated he understood each of his rights, the following exchange took place:

> "DETECTIVE: Okay. You've been here before, right?
>
> DEFENDANT: Yeah.
>
> DETECTIVE: Okay, Uh—Robert Macias has been in here. Robert has been saying some things about you—
>
> DEFENDANT: Um-huh.
>
> DETECTIVE: —and we wanted to talk to you about them. You want to talk to us about that?

> DEFENDANT: Not really, no." (Internal quotation marks omitted.) *Flores*, 2014 IL App (1st) 121786, ¶ 31.

The court then explained that after this exchange,

> "The detective continued to ask questions, and when he asked [the] defendant if he had anything to say about the gun, [the] defendant shook his head indicating no. The detective followed that and asked, 'you don't know something about the gun?' [The] [d]efendant answered no. A few minutes later, the detective said that he wanted to hear what [the] defendant ha[d] 'to say about it.' [The] [d]efendant responded that he 'ain't gonna say nothing about nothing.' " *Id.* ¶ 32.

¶ 110    The *Flores* court found the defendant's statement of "[n]ot really, no" was a clear and unequivocal invocation of his right to remain silent and that, "even if [the] defendant's initial response was unclear *** his later comment that he 'ain't gonna say nothing about nothing,' unequivocally showed that he had invoked his right to remain silent." *Id.* ¶¶ 55, 57.

¶ 111    In *R.C.*, 108 Ill. 2d at 352, "[a]fter being advised of his rights, [the defendant] stated that he did not wish to talk to [the officer]," and the officer continued to question the defendant. The court found that the defendant's statement that he did not want to talk to the officer was an invocation of his right to silence that "was not 'scrupulously honored' " and that, in fact, "it was not honored at all." *Id.* at 354.

¶ 112    In both *Flores* and *R.C.*, the court found an invocation of the right to silence where the defendants clearly indicated they did not want to talk shortly after they were Mirandized and, when asked whether they wished to talk to the officers, clearly responded in the negative. *Flores*, 2014 IL App (1st) 121786, ¶ 31; *R.C.*, 108 Ill. 2d at 352; see also *Hernandez*, 352 Ill. App. At 785-86 (finding an unequivocal invocation of the right to silence when the defendant answered, " '[n]o,

31

not no more' " to the question of "whether, '[u]nderstanding these rights, [he] wish[ed] to talk to [them] now'"); *People v. Brown*, 171 Ill. App. 3d 993, 995, 998 (1988) (finding that the defendant invoked his right to remain silent when, after being readvised of his *Miranda* rights, he answered the question " '[u]nderstanding these rights to you wish to talk to us now?' " by saying, " '[n]o' " and concluding that the questioning should have immediately ceased).

¶ 113   Because Mr. Ward made his first statement that he did not want to talk to the detectives approximately an hour after he was Mirandized, and his remaining two statements hours after that, this case is not aligned *temporally* with *Flores* or *R.C.* However, a recent decision of this court, *People v. Cox*, 2023 IL App (1st) 170761, has made clear that the temporal distance between *Miranda* warnings and an alleged invocation is not always determinative in considering whether a defendant has invoked his right to silence.

¶ 114   In *Cox*—which was issued after the parties submitted their briefs, but which Mr. Ward was given leave to cite as additional authority—the defendant told the detectives at least 45 minutes into his interrogation, " 'I don't wanna answer no more questions, 'cause I can't help you. And I don't wanna dig myself into a hole.' " *Id.* ¶¶ 45-46. At that point, the detectives temporarily stopped questioning him but resumed three hours and 55 minutes later. *Id.* ¶ 46. This court found that the facts of the case were "analogous to those in *Flores*, *Hernandez*, and *Brown*" and that the defendant's statement was a clear and unequivocal invocation of the right to the remain silent. *Id.* ¶ 52. *Cox* makes clear that a gap between the warnings and the alleged invocation of the right to remain silent is not determinative.

¶ 115   As *Cox* also reminds us, the response of the interrogators can support a defendant's claim that he has clearly cut off questioning. Mr. Ward made three statements throughout his interrogation that he argues were invocations of the right to silence—"I ain't got nothin' else to

say" at 1:41 a.m., "[g]ot nothin' to say" at 4:03 a.m., and "don't want to say nothing else about it" at 7:17 a.m. This is similar to *Cox*, where the police left for even longer—almost four hours—although there it only occurred one time.

¶ 116   Our supreme court made clear in *People v. Nielson*, 187 Ill. 2d 271, 287 (1999), that a questioning officer's reaction to a purported invocation is often relevant. The court found that by ceasing their questioning and immediately returning the defendant to his cell after he placed his hands over his ears and chanted " 'nah nah nah,' " the officers in that case had "interpreted [the] defendant's conduct as an expression of his desire to terminate the interview" and that this bolstered the court's conclusion that the defendant had invoked his right to remain silent. *Id.* In short, in this case, as in *Cox* and the other cases that Mr. Ward relies on, we believe the evidence demonstrates that he invoked his right to remain silent.

¶ 117   The State relies on two cases—*People v. Aldridge*, 79 Ill. 2d 87 (1980), and *People v. Kronenberger*, 2014 IL App (1st) 110231—where the court did not find an invocation of the right to remain silent. The supreme court in *Aldridge* did not provide details as to exactly what statements the defendant alleged were invocations of his right to silence, but those details are in the appellate court decision that the supreme court affirmed. See *People v. Aldridge*, 68 Ill. App. 3d 181, 186-87 (1979). As the appellate court described it, after being formally charged with murder, the defendant

> "approached a jailer and expressed his desire to confess the crime with which he had been charged. He signed a waiver of rights form and was also orally advised of his *Miranda* rights. *** During this interrogation, [the] defendant several times indicated a desire not to continue describing the details of the offense, but the officers continued to question him."
> *Id.* at 184.

The statements relied on by the defendant included, after answering a question, his statement, " 'so anyway have you got enough?' " and his response, when asked whether he took a certain road, of " '[y]es, I guess that would be it. *** I think you got enough, you got the story now.' " *Id.* at 186. Based on these and similar statements, the defendant argued before the appellate and supreme courts that he had invoked his right to remain silent; both courts disagreed. *Id.*; *Aldridge*, 79 Ill. 2d at 95. The supreme court concluded that "[r]ather than attempting to terminate the questioning altogether, [the] defendant merely resisted answering questions concerning particular details of the offense to which he had confessed." *Aldridge*, 79 Ill. 2d at 95.

¶ 118   In *Kronenberger*, 2014 IL App (1st) 110231, during a short conversation, the defendant had given the police some details about the crime but denied being the shooter. *Id.* ¶ 37. About 10 minutes after that conversation, the detectives reentered the interrogation room, at which time one detective asked the defendant, " '[a]re you done talking to me? Are you done talking to all of us?' " and the defendant responded, " '[y]eah.' " *Id.* The court found this was not a clear and unequivocal invocation of his right to remain silent, explaining that it was "unclear from the defendant's response whether he wished to invoke his constitutional right to silence or whether he, after having spoken to [the detective] in the earlier 14-minute conversation, had nothing else to tell the detectives." *Id.* ¶ 37.

¶ 119   This case is different than *Aldridge* and *Kronenberger*. In contrast to those cases, there was nothing about Mr. Ward's statements that suggested he simply did not want to provide further details about the crime because he believed the police already had enough information. Rather, in each of his statements, Mr. Ward said that he had "nothing" to say. The State suggested at oral argument that having nothing to say is different than not wanting to answer any more questions, but we find this to be a distinction that, in this case at least, is without a difference. In contrast to

the cases the State relies on, Mr. Ward's assertion of his desire to stop answering questions did not come in the context of an ongoing back and forth with the detectives. All three times that Mr. Ward invoked his right to remain silent, he indicated that he was done talking and the detectives left the interrogation room. This does not fit into the State's scenario of a defendant who simply wants to change the subject.

¶ 120   Once a defendant has invoked his right to silence, "the interrogation may be resumed and any statement resulting from renewed questioning is admissible only if the suspect's right to remain silent was 'scrupulously honored.' " *R.C.*, 108 Ill. 2d at 353 (quoting *Michigan v. Mosley*, 423 U.S. 96, 103-04 (1975)). The State does not even suggest in its brief that that was the case here, relying solely on its argument that there was no invocation. Here, the detectives temporarily halted the interrogation each time Mr. Ward said he had nothing else to say, nothing to say, and did not want to say anything else. However, Mr. Ward was never given a fresh set of *Miranda* warnings, and the detectives never interrogated Mr. Ward about anything other than the shooting of Ms. Pendleton. The statements Mr. Ward made after he invoked his right to remain silent are therefore inadmissible, and the trial court erred in denying his motion to suppress them.

¶ 121   In its initial response brief, the State did not argue in the alternative that any error here was harmless. Two days before oral argument, however, the State asked to file a supplemental response brief in part to argue just that—if the admission of Mr. Ward's statements was in error, it was harmless. We allowed the State to file the supplemental brief.

¶ 122   We first note that under our supreme court rules, both appellees and appellants forfeit any points not argued in their initial briefs. See Ill. S. Ct. Rs. 341(h)(7) ("Points not argued [by appellant in the opening brief] are forfeited"); 341(i) (requiring that appellee briefs comply with Rule 341(h)(7)) (eff. Oct. 1, 2020). Regardless of the State's forfeiture of this argument, we agree

with Mr. Ward that in light of the remaining evidence, we cannot say it appears beyond a reasonable doubt that the admission of his confession did not contribute to the jury's finding of guilty. *Cox*, 2023 IL App (1st) 170761, ¶ 56.

¶ 123   In support of its harmless error position, the State largely relies on its closing argument at trial—both on how relatively little time the State spent on Mr. Ward's confession (approximately only four pages in over twenty-five of closing argument transcript) and on the assertion there that, even without the confession, the jury could find Mr. Ward guilty beyond a reasonable doubt. But closing arguments are not evidence. *People v. Sanders*, 2020 IL App (3d) 180215, ¶ 13. More importantly, the question before us is not whether the State believed at trial that the evidence was sufficient to sustain a guilty verdict without Mr. Ward's confession; rather, the question is whether the State can "prove beyond a reasonable doubt that the jury verdict would have been the same absent the error." *People v. Thurow*, 203 Ill. 2d 352, 363 (2003).

¶ 124   As our supreme court has recognized, "[c]onfessions carry 'extreme probative weight,' and therefore the admission of an unlawfully obtained confession rarely is harmless error." *People v. St. Pierre*, 122 Ill. 2d 95, 114 (1988). And although we have found the evidence was sufficient, it was certainly not overwhelming. No physical evidence directly linked Mr. Ward to the shooting. Just one of the students—Mr. Abdul—positively identified Mr. Ward as the shooter, but he only became 100% positive of that identification at trial. We are not convinced that, as the State contended at oral argument, Mr. Abdul's identification alone would be enough to sustain Mr. Ward's conviction. Mr. Abdul was not certain of his identification of Mr. Ward as the shooter in an in-person lineup just days after the shooting and, contrary to the State's position at oral argument, Mr. Abdul acknowledged at trial that he had kept up with the case on social media and saw photos of Mr. Ward. The only other evidence that tied Mr. Ward directly to the shooting were

36

statements from alleged fellow gang members who largely recanted at trial. The remaining evidence was largely circumstantial—Mr. Evans who said the shooter drove a white car similar to Mr. Ward's mother's car and wore a sweatshirt the same color blue as the one recovered from Mr. Ward, and testimony that Mr. Ward's and Mr. Williams's cell phones hit cell towers that were consistent with the State's theory of the case. Particularly in light of the "extreme probative weight" confessions carry, we simply cannot say this is one of those rare cases where it is beyond reasonable doubt that the jury would have found Mr. Ward guilty even without his confession. The admission of his inculpatory statements at trial was not harmless.

¶ 125                                    VI. CONCLUSION

¶ 126   For the foregoing reasons, we reverse the trial court's denial of Mr. Ward's motion to suppress his statements and remand for a new trial without the use of any inculpatory statements he made after invoking his right to remain silent.

¶ 127   Reversed and remanded.

## *People v. Ward*, 2023 IL App (1st) 190364

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 13-CR-5242, the Hon. Nicholas Ford, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Jennifer L. Bontrager, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, David Iskowich, and Tyler J Cox, Assistant State's Attorneys, of counsel), for the People. |