NOTICE

Decision filed 08/17/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 220007

NO. 5-22-0007

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jackson County. |
| | ) | |
| v. | ) | No. 18-CF-448 |
| | ) | |
| JERED McPIKE, | ) | Honorable |
| | ) | Ralph R. Bloodworth III, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE McHANEY delivered the judgment of the court.
Justices Welch and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court did not err in denying defendant's motion to suppress statements made while in custody where defendant did not unequivocally invoke his right to counsel before confessing to detectives in a recorded interview; further, the record does not support a claim of ineffective assistance of counsel where the defendant failed to meet his burden to establish prejudice.

¶ 2    Following a jury trial, the defendant, Jered McPike, was found guilty of armed robbery (720 ILCS 5/18-2(a)(2) (West 2020)). On December 8, 2021, the defendant was sentenced to 8 years in the Illinois Department of Corrections, plus a 15-year firearm enhancement, for a total of 23 years, and 18 months of mandatory supervised release. On appeal, the defendant argues that the trial court erred in denying his motion to suppress statements he made to the police while in custody, that the error was not harmless beyond a reasonable doubt, and that trial counsel was ineffective for failing to object to the jury being able to see and hear portions of the interrogation

1

video in which he invoked his right to counsel. Late notice of appeal was allowed on July 1, 2022. This appeal followed.

¶ 3    For the reasons that follow, we affirm the defendant's conviction.

¶ 4                                I. BACKGROUND

¶ 5                    A. Defendant's Motion to Suppress Statements

¶ 6    Prior to trial, defense counsel filed a motion to suppress statements the defendant made to the police while he was in custody. The motion alleged, *inter alia*, that the statements were obtained as a result of an interrogation that continued after the defendant had elected to consult with an attorney prior to further questioning. Specifically, the defendant was seeking to bar the jury from seeing the video of the police interview wherein he made incriminating statements.

¶ 7    The hearing on the defendant's motion to suppress statements was held on the morning of the jury trial. Detective Lee Stewart testified that prior to the interview of the defendant, he advised the defendant of his *Miranda* rights. The defendant signed a written form indicating that he understood his *Miranda* rights and was waiving them. The video interview revealed that after the defendant agreed to speak to the police, Detective Stewart asked him a series of demographic questions, which the defendant answered.

¶ 8    Another officer entered the room to inform Detective Stewart and the defendant that the interrogation was being moved to a different room. After entering the second room, the other officer told the defendant that he and his codefendant were in a race to see who would spill the beans first, and the other officer urged the defendant not to "burn" himself by staying quiet and then left the room.

¶ 9    Detective Stewart asked if the defendant went into the gas station because he needed the money for drugs or just to get by. The following colloquy ensued:

2

"DEFENDANT: It's just a lot to take in bro, honestly. I wanna talk to you, bro, but I ain't got no lawyer present, though, honestly. Honestly, for real.

DETECTIVE STEWART: It's up to you man. I'm not gonna try to tell you to talk without a lawyer present or anything else. It's your choice. But I'm just giving you the opportunity to come clean with me and be honest. I mean, I know what happened, you know what happened. I'm just trying to give you the opportunity to tell your side of the story. It's up to you.

DEFENDANT: I'm scared.

DETECTIVE STEWART: I know you're scared. You wanna talk to me, or what do you want?

DEFENDANT: Um, I ain't for no drug money; it was just to get by. If you want to know that, to answer your question.

DETECTIVE STEWART: It was just to get by?

DEFENDANT: It was just to get by, bro.

DETECTIVE STEWART: So you want to talk to me, or, you want to talk to me and tell me what happened, or you, you need a lawyer, or what do you want? It don't matter to me.

DEFENDANT: Is it possible, if I could have a lawyer present?

DETECTIVE STEWART: If you want a lawyer, that's fine, man. We're good to go.

DEFENDANT: I just, I just want like, shit, I don't know. You got [indecipherable].

DETECTIVE STEWART: I can't—I can't get you one today.

DEFENDANT: Alright.

DETECTIVE STEWART: And I'll be honest with you, they're not going to come in today. If you want a lawyer, you're good. I'll walk out of here right now, that's fine. No biggie. I don't, I'm not judging you either way.

DEFENDANT: Mmm. I just ain't sure, bro. [Indecipherable] I did this right here for the bread."

¶ 10 Detective Stewart asked if the defendant said he needed the bread, and the defendant said yes, but added, "I ain't even go in that motherfucker, bro." The defendant then said something about "a four-man job" and that he was only supposed to take the bag. When asked about the other two men, the defendant said he did not know them.

¶ 11 Detective Stewart asked the defendant once again if he wanted to talk to him. The detective explained that if he did not want to talk, then Detective Stewart could not talk to him. At that point, the defendant said he wanted to "just plead the Fifth." Detective Stewart responded, "That's fine man. If you change your mind, let me know." Once the defendant invoked his right to remain silent, Detective Stewart left the room and the interview ended.

¶ 12 After viewing the interview video and hearing the evidence, the trial court denied the motion to suppress finding that there was no clear and unequivocal invocation of the right to counsel; that even if there was a clear and unequivocal invocation of the right to counsel, the video revealed that the defendant reinitiated the conversation and statements; and that the defendant's statements were freely, knowingly, and voluntarily given with no coercion or undue influence or promises made.

¶ 13 During trial, defense counsel did not object to the jury being shown the interview video wherein the defendant had made incriminating statements before invoking his right to remain

4

silent. It is unclear from the record whether the entire video was shown to the jury or merely portions of it.

¶ 14                                    B. Evidence Adduced at Trial

¶ 15     At trial, JoLee Davis testified that she was working at Omar's Gas Station on October 29, 2018. Her work colleague, Samantha Brandon, who was also her girlfriend, was present that day. Towards the end of her shift, around 1:30 p.m., Davis was counting her drawer when two men in masks entered the station with guns and told everyone to get down on the ground and give them money. One man was wearing a Halloween mask described as an "old, white man mask," and the other man was wearing a ski mask. Davis was unable to see their faces or hands because they were covered from head to toe. One man was carrying a black gun, and the other man was carrying a silver gun.

¶ 16     The man in the black ski mask came behind the counter where Davis was and put the gun in her ribs while the other man walked around and surveyed the area as she struggled to open the cash register. The man in the Halloween mask did most of the talking.

¶ 17     When Davis was finally able to get the register open, she observed the two men take all of the money, an envelope full of cash drops and credit card receipts, along with some cigars and cigarettes. The envelope had Davis's name written on it along with her cashier number, the date, and her shift number. The men eventually left the station on foot. At trial, Davis identified photographs of the envelope with her name on it containing the receipts and cash drops she had done that day along with the cigars, cigarettes, guns, and masks.

¶ 18     Samantha Brandon testified that although she worked as a manager at the station, she was not on duty at 1:30 p.m. on October 29, 2018; rather, she was helping Davis who was working that day. Brandon was unable to discern their races because the individuals were completely covered

5

up. Once Davis was able to get the register open, the two individuals grabbed the money. After they left, Brandon called 911 to report that a black man and a white man had robbed the store. She based this information on what she was told by Davis.

¶ 19    Police Chief Stan Reno testified that on October 29, 2018, at approximately 1:35 p.m., he received a call requesting all available officers to respond to a robbery in progress at Omar's Gas Station. The description of the suspects was a black male and a white male wearing masks and armed with handguns. Chief Reno went to set up a perimeter a few blocks from the station. As he was sitting in his unmarked police vehicle, he heard another officer over the radio state that he was in foot pursuit of two people. Approximately 11 to 12 minutes after the initial radio call, Chief Reno observed two black males running towards his unmarked police vehicle. One of them was wearing a purple backpack with black back straps and black backing. As Chief Reno approached the men in his vehicle, they noticed him and turned to run away. He got out of his vehicle and began a foot pursuit. When the suspects split up, Chief Reno continued to pursue the suspect without the backpack. He was eventually able to tackle the suspect to the ground and apprehend him. Other officers apprehended the suspect with the backpack approximately 30 to 40 yards away. At trial Chief Reno identified the defendant as the man with the backpack who had been apprehended by the other officers.

¶ 20    Officer Bryan Pyatt with the Southern Illinois University (SIU) police department testified that he was on duty on October 29, 2018, when at approximately 1:30 p.m. he heard SIU dispatch report that city police were responding to a potential robbery. The dispatch briefly described the suspects as possibly two black males with hooded sweatshirts and masks. Officer Pyatt drove to the area to offer mutual aid. As he was driving to the area, he observed two black males that appeared to be crouching or ducking down. Because their behavior seemed suspicious in light of

6

the robbery report, he exited his vehicle and attempted to speak to the men. At this point, the men started running, and the officer began to chase them. He observed the man with the backpack run into a wooded area. When the officer apprehended the man, he ordered him to throw the backpack down. The man threw the backpack into the wooded area, and the officer took him into custody.

¶ 21 Officer Trenton Harrison was on duty as a patrol officer on October 29, 2018. At approximately 1:35 p.m., Officer Harrison was approximately a block and a half away when he received a dispatch notification of the robbery at Omar's Gas Station. The officer arrived at the scene in less than 10 seconds of the call and set up a perimeter until the canine officer could arrive to track which way the suspects went. At some point he observed Chief Reno had a black male on the ground and was taking him into custody. He also observed Officer Pyatt and another officer had taken another black male into custody. Officer Pyatt informed Officer Harrison that the suspect had thrown a backpack into the tree line. After the scene was secure, Officer Harrison went to the tree line and retrieved the backpack which he described at trial as purple with black straps. When he opened the backpack, the officer saw a large wad of cash, an envelope, purple latex-style gloves, cigarettes, and cigars. The officer also saw another blue bag inside the backpack. This blue bag contained dark-colored clothing, a black ski mask, and an old man Halloween mask. In addition, the officer found two handguns; one was a black handgun and the other was a handgun style BB gun with a black handle and a silver slide. He photographed the items before collecting them as evidence.

¶ 22 Detective Lee Stewart testified that he spoke to the defendant in the processing area at the police department on October 29, 2018, shortly after 3 p.m. After advising the defendant of his *Miranda* rights, the detective asked the defendant about his involvement in the robbery at the gas station earlier that day. The interview, which was recorded on video, lasted approximately 10 to

7

15 minutes. A video recording of the interview with the defendant was admitted into evidence and played to the jury.

¶ 23 Detective Stewart collected a buccal swab DNA sample from the defendant. This sample was sent to the Illinois State Police Crime Lab along with the handgun and the old white man mask collected from the crime scene. DNA analysis conducted by the crime lab revealed nothing that connected the handgun to the defendant.

¶ 24 Suzanne Kidd, a forensic scientist specializing in forensic biology and DNA, was employed at the crime lab. Kidd conducted the DNA analysis of the items sent to the crime lab. Kidd testified that she found a mixture of at least three individuals on the Halloween mask. She was able to identify a major profile within that mixture and compare it to the two standards that had been sent to the lab: one standard belonging to the defendant and the other standard belonging to the other suspect. DNA analysis determined that the other suspect was excluded as the source of the DNA found on the Halloween mask but revealed that the defendant could not be excluded as being the source. Kidd testified that the DNA profile developed from the Halloween mask matched the DNA profile of the defendant. At the close of the State's evidence, defense counsel made a motion for a directed verdict, which the trial court denied.

¶ 25 In closing, the State reminded the jury that the defendant told Detective Stewart during interrogation that he committed this offense "for the bread." The defendant in his closing emphasized that he told Detective Stewart that he had never been inside of "that store" and that the defendant had requested an attorney during the interrogation.

¶ 26 C. Posttrial Motions

¶ 27 Following his conviction, the defendant filed a motion for reconsideration and/or new trial, but the motion did not raise the issue involving the jury seeing the interview video, which

8

contained defendant's incriminating statements. On March 30, 2020, a new defense attorney entered his appearance and filed a motion for new trial asserting, *inter alia*, that: "On September 18, 2019, the Court erred in denying Defendant's motion to suppress identification because [the defendant']s confession was legally involuntary since he was placed in *a coercive environment*." (Emphasis added.) In his supporting memorandum of law, the defendant argued that his "waiver of his *Miranda* rights was not voluntary or knowing and intelligent." The motion was denied.

¶ 28    On December 8, 2021, the defendant was sentenced to 8 years in the Illinois Department of Corrections, plus the 15-year firearm add-on, for a total of 23 years, plus 18 months of mandatory supervised release. This appeal followed.

¶ 29    Following oral argument on March 23, 2023, the defendant sought leave to cite as additional authority the case of *People v. Ward*, 2023 IL App (1st) 190364 (opinion not released for publication as of August 3, 2023), which is a published decision from another district issued on March 31, 2023. We granted the motion.

¶ 30                                    II. ANALYSIS

¶ 31    The defendant raises two issues on appeal. The defendant first asserts that the trial court erred in denying his motion to suppress statements he made to the police where the officer failed to cease the interrogation after the defendant invoked his right to counsel, and second that the error was not harmless beyond a reasonable doubt.

¶ 32    The State posits that the defendant forfeited this claim of error because he did not properly preserve it for appeal. It is well settled that a defendant must raise an objection at trial and in a written posttrial motion to properly preserve an issue for appellate review. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Although the defendant raised this issue in his motion to suppress statements, he failed to raise it in either of his posttrial motions for new trial. On appeal, the

defendant raises a claim not previously raised: that he invoked his right to counsel which the police did not honor. Therefore, the State argues, the defendant has forfeited this claim, and this court should not consider it on appeal. Alternatively, the State maintains that the trial court properly denied the defendant's motion to suppress after finding that the defendant did not make a clear and unequivocal invocation of his right to counsel.

¶ 33 The defendant counters that his second motion for new trial stated that he "was essentially cut off from the outside world without the benefit of friends, family, *or counsel*." (Emphasis added.) He insists that the motion also asserted that his *Miranda* waiver "was not voluntary or knowing and intelligent"—language that tracks almost perfectly with the trial court's holding that the defendant's statements "were freely, knowingly, and voluntarily given." We find the defendant's argument unpersuasive.

¶ 34 Pursuant to the Code of Criminal Procedure of 1963, a motion for a new trial shall specify the grounds therefor. 725 ILCS 5/116-1(c) (West 2020). "Broad and general allegations in a post[ ]trial motion are inadequate to advise the court of the challenge being raised, and are inadequate to preserve an issue for appellate review." *People v. Johnson*, 250 Ill. App. 3d 887, 893 (1993). Here, the defendant's motions for new trial lacked the specificity required to preserve the issue for appeal; thus, he has forfeited this claim. However, that is not the end of the analysis.

¶ 35 Where a defendant has forfeited appellate review of an issue, the reviewing court will consider only plain error. *People v. McLaurin*, 235 Ill. 2d 478, 495 (2009). "Under the narrow and limited plain error exception to the general forfeiture rule, a reviewing court may consider forfeited errors where the evidence was closely balanced or where the error was so egregious that defendant was deprived of a substantial right and thus a fair trial." *People v. Roman*, 2013 IL App (1st) 102853, ¶ 19. "To obtain relief, defendant must first show that there was a clear or obvious error."

10

*Id*. "The burden of persuasion remains with defendant, and the first step in plain error review is to determine whether any error occurred." *Id.*

¶ 36                              A. Motion to Suppress Statements

¶ 37    In general, reviewing courts apply a bifurcated standard of review to a trial court's ruling on a motion to suppress statements: deference under a manifest-weight standard to the trial court's credibility determinations and findings of fact, and *de novo* review on questions of law, including the ultimate question of whether the statements should have been suppressed. *People v. Tucker*, 2022 IL App (1st) 172982, ¶ 36. Here, the parties do not dispute what was said during the video interview; rather, they dispute whether the defendant's words constituted an invocation of his fifth amendment right to counsel. See *People v. Schuning*, 399 Ill. App. 3d 1073, 1081 (2010). Accordingly, we review *de novo* the trial court's ultimate legal conclusion that suppression was unwarranted.

¶ 38                              B. Invocation of the Right to Counsel

¶ 39    The United States Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 471 (1966), held that before an accused can be subject to custodial interrogation, he must be advised of his rights including the right to remain silent, the right to consult with an attorney, and the right to have an attorney present with him during interrogation. Following a knowing and voluntary waiver of his *Miranda* rights, officers are free to question a defendant up to the point that he makes an unambiguous or unequivocal invocation of his right to counsel. *Davis v. United States*, 512 U.S. 452, 458 (1994). When an accused invokes his right to counsel during custodial interrogation, the police must cease questioning the defendant until counsel is present. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). The mere mention of a lawyer by the defendant during interrogation, however, is not an invocation of the right to counsel. See *Davis*, 512 U.S. at 459. Where the defendant makes

11

an ambiguous or equivocal reference to an attorney such that a reasonable officer in light of the circumstances " 'would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning.' " (Emphasis in original.) *Schuning*, 399 Ill. App. 3d at 1082 (quoting *Davis*, 512 U.S. at 459). "Whether a defendant has invoked his right to counsel is an objective inquiry." *Id.* "The Illinois Supreme Court has affirmatively adopted the *Davis* objective inquiry as the threshold analysis in determining whether a defendant has invoked his right to counsel." *Id.* Thus, we must determine whether the defendant's words constituted an unambiguous or unequivocal request for an attorney at some point prior to his invocation of his right to remain silent.

¶ 40       While a defendant need not articulate his desire for an attorney in the manner of a Harvard linguist, he must articulate his desire in a clear enough manner that a reasonable officer in similar circumstances would understand the statement to be a request for an attorney. *Id.* (citing *Davis*, 512 U.S. at 459). Where a defendant makes an ambiguous or equivocal reference to an attorney during interrogation, it is good police practice to clarify whether the defendant actually wants an attorney; however, such clarification is not required. *In re Christopher K.*, 217 Ill. 2d 348, 378-79 (2005).

¶ 41       In support of his argument, the defendant cites *People v. Howerton*, 335 Ill. App. 3d 1023, 1026 (2003), in which this court found that a suspect had clearly and unequivocally invoked his *Miranda* rights by asking the interrogating officer, "Well, can I have a lawyer then?" It is hard to imagine a more unambiguous and unequivocal example of a defendant's invocation of his right to counsel. Moreover, the *Howerton* court found that the defendant clearly and unequivocally invoked his *Miranda* rights on five separate occasions during interrogation by the police: "Take me upstairs then if I'm under arrest. Either that or I want a lawyer because—"; "Get me a lawyer.

12

Take me upstairs, because there's nothing I can tell you"; "Take me upstairs and let me get my lawyer because there's nothing I can tell you"; "Well, can I have a lawyer then"; and "Just book me. I'll have to get a lawyer and try it in court." *Id.* Not only did the officers not attempt to clarify whether the defendant was invoking his right to counsel, they ignored his requests and continued to badger him to disclose what he knew about a murder and attempted murder investigation. *Id.* By contrast, in the instant matter, the first phrase identified as an invocation of the defendant's right to counsel—"I wanna talk to you, bro, but I ain't got no lawyer present"—was simply a statement of the obvious rather than an unambiguous or unequivocal request for counsel.

¶ 42    The defendant argues that his next statement was an even stronger invocation of his right to counsel. However, the statement, taken in context, belies such an argument:

> "DEFENDANT: Is it possible, if I could have a lawyer present?
>
> DETECTIVE STEWART: If you want a lawyer, that's fine, man. We're good to go.
>
> DEFENDANT: I just, I just want like, shit, I don't know."

Although not required to do so, Detective Stewart sought to clarify whether the defendant was invoking his right to counsel. *In re Christopher K.*, 217 Ill. 2d at 378-79. The defendant's next statement—"I just, I just want like, shit, I don't know"—was not an unambiguous or unequivocal request for an attorney such that Detective Stewart would have understood that he was required to cease questioning the defendant. *Schuning*, 399 Ill. App. 3d at 1082. See also *Davis*, 512 U.S. at 454-55 (petitioner's remark, "Maybe I should talk to a lawyer," was not a request for counsel); *Lord v. Duckworth*, 29 F.3d 1216, 1220-21 (7th Cir. 1994) (the defendant's statement, "I can't afford a lawyer but is there any way I can get one?" was not a clear and unequivocal request for an attorney under the circumstances); *People v. Krueger*, 82 Ill. 2d 305, 307-09 (1980) (defendant's comments, "Maybe I ought to have an attorney," "Maybe I need a lawyer," or "Maybe

13

I ought to talk to an attorney," made following *Miranda* warnings were not clear invocations of the right to counsel).

¶ 43    Citing as additional authority *People v. Ward*, 2023 IL App (1st) 190364, the defendant notes that an invocation of a right to counsel is analyzed under the same rubric as the invocation of the right to remain silent. See *Wainwright v. Greenfield*, 474 U.S. 284, 295 n.13 (1986) (interpreting invocation of right to counsel as simply an extension of the right to silence). The defendant argues that the factual similarities in *Ward* make it particularly persuasive on the issue of whether the defendant invoked his *Miranda* right to counsel during his police interrogation.

¶ 44    In *Ward*, the defendant maintained that during custodial interrogation he invoked his right to silence on three occasions when he stated: "I ain't got nothin' else to say"; "[g]ot nothin' to say"; and "don't want to say nothing else about it." *Ward*, 2023 IL App (1st) 190364, ¶ 102. Defense counsel challenged the statements in a motion to suppress, but the trial court denied the motion and permitted the prosecution to use the statements at trial. *Id*. ¶¶ 65-66. After each of the three times the defendant alleged that he invoked his right to silence, the detectives took a break but then eventually resumed questioning him. *Id*. ¶ 102. After being held for approximately 12 hours, the defendant ultimately made several inculpatory statements to a second team of detectives. *Id*. Reviewing *de novo*, the First District reversed and remanded finding, *inter alia*, that the defendant had invoked his right to remain silent and that his invocations of his right to silence were clear and unequivocal. *Id*. ¶¶ 120-24. We find *Ward* factually distinguishable and unpersuasive.

¶ 45    Here, applying the objective standard found in *Davis* to the facts before us, we find that the defendant did not make an unambiguous or unequivocal request for an attorney at any point prior to invoking his right to remain silent. *Schuning*, 399 Ill. App. 3d at 1082 (citing *Davis*, 512 U.S.

14

at 459). Accordingly, we find that the trial court did not err in denying the defendant's motion to suppress the statements he made to the police during the custodial interview.

¶ 46                                    C. Effective Assistance of Counsel

¶ 47    The defendant next asserts that he was denied effective assistance of trial counsel. Specifically, the defendant contends that trial counsel failed to object to the jury being able to see and hear the portions of the interrogation video in which he claimed to invoke his right to counsel and his right to silence. In turn, the defendant argues that counsel's performance prejudiced him such that this court should reverse and remand for a new trial. Because we find that the defendant did not invoke his right to counsel at any point prior to invoking his right to silence, there is no occasion to examine whether his trial counsel was ineffective for failure object to the video.

¶ 48    The defendant next argues that his trial counsel's failure to object at trial to certain portions of the video violated *Doyle v. Ohio*, 426 U.S. 610 (1976). The defendant does not contend that the State improperly elicited testimony at trial that he invoked his fifth amendment right to remain silent. Nor does the defendant contend that the State made any comments during closing argument which violated *Doyle*. Instead, the defendant's argument is based on the content of his video-recorded interview that was seen by the jury.

¶ 49    A defendant's claim of ineffective assistance of counsel is analyzed under the two-pronged test set forth in *Strickland v. Washington,* 466 U.S. 668 (1984). *People v. Veach*, 2017 IL 120649, ¶ 29. To prevail on a claim of ineffective assistance of counsel, "a defendant must show that counsel's performance was (1) deficient and (2) prejudicial." *People v. Westfall*, 2018 IL App (4th) 150997, ¶ 61. To establish counsel's deficient performance, a defendant must show that "counsel's performance 'fell below an objective standard of reasonableness.' " *People v. Valdez*, 2016 IL 119860, ¶ 14 (quoting *Strickland*, 466 U.S. at 688). To establish prejudice, a defendant must show

15

that a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *People v. Evans*, 209 Ill. 2d 194, 219-20 (2004) (citing *Strickland*, 466 U.S. at 694). "Failure to satisfy either prong negates a claim of ineffective assistance of counsel." *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 88.

¶ 50 Whether trial counsel provided effective assistance is a mixed question of fact and law. *People v. Davis*, 353 Ill. App. 3d 790, 794 (2004). Therefore, a reviewing court will defer to a trial court's findings of fact but will make an independent judgment about the ultimate legal issue. *Id*. "We review *de novo* whether counsel's omission supports an ineffective assistance claim." *Id*.

¶ 51 D. Invocation of Right to Remain Silent

¶ 52 The United States and Illinois Constitutions include the right to not be a witness against oneself. See U.S. Const., amend. V; Ill. Const. 1970 art. I, § 10. Thus, to protect a defendant's right not to be a witness against himself, police interrogation must cease once the defendant indicates in any manner and at any time prior to or during a custodial interrogation that he wishes to remain silent. *People v. Flores*, 2014 IL App (1st) 121786, ¶ 37 (citing *People v. Hernandez*, 362 Ill. App. 3d 779, 785 (2005)). Any statement taken after invocation by the defendant of his right to remain silent " ' "cannot be other than the product of compulsion, subtle or otherwise." ' " *Id.* (quoting *Hernandez*, 362 Ill. App. 3d at 785, quoting *Miranda*, 384 U.S. at 474).

¶ 53 "In *Doyle v. Ohio*, 426 U.S. 610, 619 (1976), the United States Supreme Court held that the prosecution generally cannot use a defendant's post-*Miranda*-warning silence for impeachment purposes without violating due process." *People v. Dameron*, 196 Ill. 2d 156, 163 (2001). A *Doyle* violation, however, may constitute harmless error. *Id*. at 164. The Illinois Supreme Court has "recognized at least five factors for a court to consider in determining whether a *Doyle* violation was harmless beyond a reasonable doubt: (1) the party who elicited the testimony

16

about the defendant's silence; (2) the intensity and frequency of the references to the defendant's silence; (3) the use that the prosecution made of the defendant's silence; (4) the trial court's opportunity to grant a mistrial motion or to give a curative jury instruction; and (5) the quantum of other evidence proving the defendant's guilt." *Id*.

¶ 54 Here, the State elicited the testimony about the defendant's silence when they offered into evidence the interview video showing the defendant state that he wanted to invoke his right to remain silent. However, there is no evidence that the jury heard the invocation more than one time, nor is there evidence that the State made any further use of the defendant's invocation. Because trial counsel failed to seek redaction of the defendant's invocation from the video, the trial court never had the opportunity to consider a mistrial or to give jurors a curative instruction. This failure goes to the very heart of the defendant's claim of a *Doyle* violation.

¶ 55 However, in reviewing the quantum of other evidence proving the defendant's guilt, we note that Chief Reno testified that within a short time after the robbery, he observed the defendant, who he later identified in court, running with a purple backpack. Inside that purple backpack were items from the robbery including a large wad of cash, an old man Halloween mask, a black ski mask, credit card receipts from the gas station, clothing items, a black and silver BB gun, and a black handgun. Also inside the backpack were other items taken in the robbery including cigarettes, cigars, and the envelope with the date, JoLee Davis's name, cashier number, and shift number written on it. Additionally, subsequent forensic testing established that the defendant's DNA matched a DNA profile taken from the old man Halloween mask. The DNA evidence, as well as the items found in the defendant's backpack, directly connected him to the commission of the armed robbery as well as the defendant's own incriminating custodial statements. In light of the overwhelming evidence of the defendant's guilt, we find the *Doyle* violation was harmless

17

beyond a reasonable doubt. Thus, the defendant did not meet his burden to establish the prejudice prong of his claim of ineffective assistance of counsel.

¶ 56                                     III. CONCLUSION

¶ 57     For the foregoing reasons, we affirm the defendant's conviction.


¶ 58     Affirmed.